Edward S. CANTON, Appellant,

v.

UNITED STATES of America,
Appellee.

No. 15262.

United States Court of Appeals
Eighth Circuit.

Oct. 20, 1955.

Rehearing Denied Nov. 15, 1955.

Hayner N. Larson, Minneapolis, Minn. (Raymond A. Scallen and Oscar G. Haugland, Minneapolis, Minn., were with him on the brief), for appellant.

Alex Dim, Asst. U. S. Atty., St. Paul, Minn. (George E. MacKinnon, U. S. Atty., St. Paul, Minn., was with him on the brief), for appellee.

Before SANBORN, COLLET, and VAN OOSTERHOUT, Circuit Judges.

VAN OOSTERHOUT, Circuit Judge.

The appellant, Edward S. Canton, hereinafter referred to as the defendant, was found guilty by a jury on a charge by information of violating 26 U.S.C. § 145(b), by filing or causing to be filed a fraudulent income tax return for the year 1947. He appeals from the denial of his motion for judgment notwithstanding the verdict and from final judgment and sentence on the guilty verdict.

Defendant, who was 53 years of age at the time of the trial, is a high school graduate, and has had one year of college education and a short course at a business school. After working for various employers in the lumber industry, he established the Canton Lumber Sales Company in Minneapolis in 1930. He has been the sole proprietor of this business at all times since, except for a period of about five years ending in 1938 when his brother Paul was associated with him as a partner. At the outset the defendant acted exclusively as a salesman for lumber mills strictly on a commission basis. The bookkeeping then was simple as the mills billed and collected from the customers and paid the defendant his commission. Later his business developed into a wholesale lumber business. The lumber was still generally shipped direct to the customer, but the defendant paid the mill and he in turn billed and collected from his customers. He usually charged a customer five per cent above his cost which was the maximum mark-up permitted by the Office of Price Administration during most of the involved period. The defendant was allowed two per cent cash discount and he allowed his customers a two per cent cash discount for prompt payment.

In 1945 lumber was hard to get. Defendant was unable to supply the needs of his customers. Defendant with Baldridge, a man with mill experience, purchased a lumber mill at Drain, Oregon, which was incorporated under the name of Douglas Timber Corporation, hereinafter sometimes referred to as Douglas. Defendant secured financial assistance for the mill purchase and operation by means of sale of stock and personal loans from many of his customers upon assurance that this would put them in a preferred position to obtain hard-to-get lumber. Baldridge died unexpectedly, so it was necessary for defendant to assume management of the lumber mill and to spend nearly all of his time in Oregon from March 1946 until October 1948 when the mill was sold. Defendant was not an experienced mill operator, and this project created many difficult financial, labor, and other problems which made heavy demands upon the defendant's time.

During defendant's absence in Oregon the bookkeeping at Minneapolis was done by his niece, Tanea Canton, since married and now Tanea Bradley. When she started working for the defendant in the

fall of 1945, Tanea was 18 years of age and had recently graduated from high school where she had taken a bookkeeping course. During most of the involved period defendant's other employees in Minneapolis were two salesmen. Tanea's duties were to compute the profits, do the bookkeeping, make out bank deposit slips, type customers' invoices, and take care of some correspondence. The defendant had instructed Tanea as to how to handle the bookkeeping. She had written down the instructions which have since been lost. Tanea said that she followed the instructions to the best of her ability and that she was not aware of the fact that any profits were being concealed. The records consisted of a cash book, order books, a car journal, a customers ledger, and invoice files. The cash book was supposed to contain entries showing all profits, including wholesale profits and commissions, and all items of business expense. The only record turned over to and used by Mr. Holl, a lumber dealer who prepared the income tax return in question and defendant's returns for many prior years, was the cash book. Further facts will be discussed hereinafter.

Defendant in his brief thus states the questions presented for review:

"The return filed for the defendant, a wholesale lumber dealer, reported a net income of $26,105.99. Concededly omitted from gross income were the following items and amounts:

(a) Special 5% discount allowed on purchases from Douglas Timber Corporation $ 5,531.03

(b) Offset of 2% discounts for prompt payment granted to and allowed by the defendant 488.23

(c) An interest check received from Douglas 1,001.39

(d) Direct sales commissions represented by two checks received from Douglas 1,911.01

Total $ 8,931.66

"The omissions represented by items (a) and (b) are reflected in detail in the defendant's books and records. Those represented by items (c) and (d) are reflected in detail in the Douglas books and records, for which the defendant was responsible.

"Not deducted on the defendant's return were the following items allowed as deductions by the Government's agents:

(e) Depreciation (Ex. 105, R. 250) $ 399.33

(f) Miscellaneous expenses, principally living and travel expenses on the West Coast (Ex. 103, R. 248) 11,259.07

Total 11,658.40

"Assuming that there were no omissions from gross income other than items (a) to (d) (and, as will be seen, there were no such other omissions), the defendant's return overstated his net income by $2,726.74 unless the cancellation by the defendant's brother of a $10,000 loan to the defendant represented income taxable to the defendant.

"The principal questions are—

"(1) Whether there is substantial competent evidence from which it could be found beyond a reasonable doubt that cancellation of the $10,000 loan was taxable income.

"(2) Whether, if question (1) should be answered in the affirmative, there is substantial evidence from which it could be found beyond a reasonable doubt that the resulting understatement in net income was due to an intent to evade.

"(3) Whether, if both question (1) and question (2) should be answered in the affirmative, there is substantial evidence of such an overt act reflecting willfulness as is required by Spies v. United States, 317 U.S. 492 [63 S.Ct. 364] and, in this connection, whether, if there is such evidence, the court erred in refusing to instruct the jury in the detail set out in the defendant's first requested instruction.

"If questions (1), (2) and (3) should all be answered in the affirmative, then

"(4) Whether the court erred in permitting resort to a circumstantial method of proving understatement in net income, there being no evidence, but on the contrary a concession, that the defendant had no additional income from the same sources as items (a) to (d) and no income from other or undisclosed sources; and, moreover, if the court did not so err, whether the circumstantial method so permitted did in fact furnish a sufficient basis for a finding beyond a reasonable doubt that there was an understatement in net income, particularly since such method purported to reflect income according to the cash method of accounting whereas the court instructed the jury (R. 193) that the defendant's business income was determinable only according to the accrual method of accounting, and since such circumstantial method in addition treated as income substantial items which the court instructed the jury did not constitute income under either method of accounting (R. 199).

"(5) Whether the court erred in instructing the jury in such a way as to permit the jury to treat as nondeductible the items (e) and (f) above, particularly the latter, which were allowed as deductions by the Government's agents.

"(6) Whether the prosecuting attorney indulged in unwarranted statements and remarks in his arguments to the jury, to the defendant's substantial prejudice."

We proceed to the consideration of the issues raised by the defendant.

 (1) Defendant upon his urgent request obtained a $10,000 loan in January 1947 from his brother Paul who was engaged in the retail lumber business at Watson, Minnesota. The loan is shown in defendant's customers ledger. Paul, in a letter to defendant dated July 7, 1947, writes:

"Dear Ed:

"Last January I turned over to your firm the sum of ten thousand (10,000.00) dollars. I think you have been carrying this amount on your books (and statements) as cash advanced against future purchases.

"In view of the fact that I agreed to share with you a percentage of my net operating profit, for acting as supplier and purchaser of hard-to-get merchandise, I have charged the sum advanced to you to the cost of such merchandise. The sum of ten thousand dollars is therefor tendered to you in lieu of any expected profit percentage. As far as I am concerned, you are authorized to remove the above mentioned sum and entry from your records of advance payments or accounts payable."

Defendant admits receiving the above letter and entering on his customers ledger a $10,000 charge to offset the $10,000 credit, and also making the following notation:

"July 7, 1947, to services rendered per letter from Paul J. Canton, $10,000." Defendant insists that the cancellation of the foregoing $10,000 loan constitutes a gift exempt from tax under section 22(b) (3) of the Internal Revenue Code, and in support cites Helvering v. American Dental Co., 318 U.S. 322, 63 S.Ct. 577, 87 L.Ed. 785, and Commissioner of Internal Revenue v. Jacobson, 336 U.S. 28, 69 S.Ct. 358, 93 L.Ed. 477. In the American Dental case,

supra [318 U.S. 322, 63 S.Ct. 581], the Court thus defines "gifts:"

"* * * Its plain meaning in its present setting denotes, it seems to us, the receipt of financial advantages gratuitously."

In the Jacobson case, supra, the Supreme Court, in reversing the Court of Appeals, held that the discount at which a solvent debtor purchased bonds upon which he was liable was income rather than a gift. Justices Reed and Douglas dissented on the basis of the American Dental case. Justice Rutledge, specially concurring, expressed the opinion that the result was in conflict with the American Dental case. The majority distinguished the American Dental case and stated 336 U.S. at page 51, 69 S.Ct. at page 370:

"The situation in each transaction is a factual one. It turns upon whether the transaction is in fact a transfer of something for the best price available or is a transfer or release of only a part of a claim for cash and of the balance 'for nothing.'"

In United States v. Burdick, 3 Cir., 214 F.2d 768, remanded 348 U.S. 905, 75 S.Ct. 311, reaffirmed, 3 Cir., 221 F.2d 932, the issue we are now considering is quite fully discussed. At page 771 of 214 F.2d we find the following:

"As we held in Smith v. Manning, [3 Cir.] 1951, 189 F.2d 345, 348 whether the receipts are gifts is primarily a question of fact to be resolved upon the peculiar circumstances of the case; the mere fact that the payments were voluntary does not establish them as gifts; if the payments were made without a donative intent and as compensation for services they constitute taxable income. * * *"

The fact issue of whether the cancellation resulted in a gift or taxable income was submitted to the jury under proper instructions. The record shows that the defendant did in fact ship considerable scarce lumber to his brother Paul. On cross-examination defendant testified as follows:

"Mr. Dim: But Paul was very grateful to you for getting lumber for him all that time? The Witness: Yes."

And at another point:

"Q. Isn't it a fact that the loan was cancelled in July because it was for procurement of lumber for Paul Canton? A. Yes."

And on further cross-examination:

"Q. Now with reference to the Paul Canton $10,000 matter for the year 1947, during that same question and answer period of October 17, 1951, didn't you state that as long as your brother, Paul, treated it as a procurement expense that you were willing to accept it as such? A. If I said that it was an error of legal knowledge."

There is also testimony of three Government agents that during the course of the investigation the defendant told them in substance that the $10,000 note cancellation was income and should have been reported. Defendant insists that this admission to the agents is an admission after the fact and as such should be corroborated. The contention in this respect is supported by Smith v. United States, 348 U.S. 147, 75 S.Ct. 194, and Opper v. United States, 348 U.S. 84, 75 S.Ct. 158. Here, there is ample corroboration. Defendant makes the further claim that the admission to the agents is one of law and not one of fact. This contention was not raised before the trial court by objection to testimony or motion to strike or in any other manner. Consequently, we are not required to consider it. In any event there is ample evidence exclusive of the admission to the agents to support the verdict.

We have not detailed all of the evidence bearing upon the gift issue. There is, of course, some evidence on this issue favorable to the defendant. The defendant testified that he made no special concessions to Paul in the delivery of lumber, that he performed no services

for him for which he was not compensated. In view of the verdict the evidence must be considered in the light most favorable to the Government. So considered the record would support a finding by the jury that the cancellation of the $10,000 loan was for services rendered and hence taxable income.

■ As heretofore noted defendant conceded omissions of income totalling $8,931.66, which total does not include the $10,000 debt cancellation. From this he sought to deduct $399.33 depreciation about which there is no serious controversy, and $11,259.07 in miscellaneous expenses of which $7,978.55 was for living expenses in Oregon, and thus establish that he had not understated his income. The Government denies that the defendant is entitled to a deduction for the Oregon living expenses. Such expenses appear in Government's Exhibit 103 and were part of the Government's proof in establishing income by the bank deposit method. The testimony of Aas, the Government agent who made the bank deposit computation, is:

"Referring to Exhibit 103 'Expenses not previously allowed for the year 1947', the item of $6,920.82 shown as living expenses at Drain, Oregon, and the item of $1,057.73 shown as business expenses were transcribed by me from information in Mr. Diracles' [defendant's accountant] records and I allowed these amounts for our bank deposit method. I did not verify them."

The trial court in ruling upon the defendant's motion for acquittal or for a new trial stated:

"* * * But merely because the Government gave the defendant the benefit of these deductions from gross bank deposits in computing net income by the bank deposit method, that fact does not necessarily establish such expenditures as deductible in determining defendant's net income from his books and records. Defendant recognized in his request for instructions to the jury that such items were deductible only to the extent that he had not been reimbursed

for such outlays from other sources. He made no record of these expenses in his books and records. The testimony is silent as to whether or not he received any reimbursement from the Douglas Timber Company. And moreover, the evidence is impelling that Canton's stay on the West Coast was primarily in the interest and in behalf of the Douglas Timber Company. True, he was promoting the Douglas Timber Company's activities so that the Canton Lumber Sales would have a source for lumber in its wholesale business. The indisputable fact nevertheless remains that the Douglas Company was an independent corporation and not a subsidiary or adjunct of the Canton Lumber Sales. It was a producer and manufacturer of lumber in Oregon. Canton Lumber Sales was a wholesaler of lumber in Minneapolis. To the extent, if any, that any portion of these expenses in light of the evidence constituted a permissible deduction for Canton as an individual in computing his 1947 income tax was a matter of considerable speculation and uncertainty. However, the Court permitted the jury to determine that question notwithstanding."

We agree with the trial court that the defendant was not entitled to these unclaimed deductions as a matter of law. It seems obvious that the Government's concession as to the living expenses was strictly limited to allowing them as an offset on the bank deposit method. The trial court violated no legal rights of the defendant in submitting to the jury the question of the living expenses to be allowed the defendant.

We are convinced that the evidence of the specific omissions alone was sufficient to warrant a finding by the jury that the defendant substantially understated his income in the 1947 return filed.

(2) Is there substantial evidence that defendant's understatement was attributable to an intent to evade taxes? It is clear that the record here would support

a finding that substantial items of income were not reported. Mr. Holl had since 1933 prepared defendant's income tax returns, obtaining all information for such returns from defendant's cash book. The jury could find that the defendant knew that his tax expert did consider only the items entered in the cash book in preparing the returns. In such a situation, where the defendant knew that any other records he might have were not being considered in making the return, the fact that he might have more complete records in other books or files would not be particularly material. In setting out profits from sales in the cash book, $488.23 in profits created by customers not taking their cash discounts is concededly omitted. Defendant also admits that he specifically instructed his bookkeeper to ignore the cash discount allowed defendant and that allowed the customers in computing profits. His explanation is that this was so handled to simplify and expedite the bookkeeping, and that a check made by him a number of years before had shown that the profit and loss occasioned by ignoring cash discounts would offset. When a car of lumber was billed to defendant at $1,000, he would deduct two per cent and remit $980 to the mill. He would then add his five per cent mark-up to the original $1,000, and bill his customer for $1,050. The two per cent discount on this would be $21. If the defendant and the customer each took the discount, the profit would be the difference between the customer's net cost of $1,029 less defendant's net cost of $980, or a total of $49. In entering the profit on such a sale, the defendant disregarded all discounts, and entered as a profit the difference between $1,050 and $1,000 or $50. Thus, where each took the discount, the result was an overstatement of profit of $1. The defendant always took his discount. If the customer overlooked his discount, the defendant would collect $1,050, and his profit would be the difference between that figure and his net cost of $980 or $70. In such a situation there would be an understatement of profit of $20. There is evidence from which the jury could find that due to material scarcity the defendant encouraged some of his customers to waive their cash discounts and that quite a number of customers did so. In 1946 the omitted income resulting from not considering the cash discounts amounted to $5,124.47.

After defendant acquired Douglas he received a five per cent discount on all his purchases, this being in addition to the usual five per cent mark-up and two per cent discount previously received. This additional five per cent discount is not reflected in his cash book and was not considered in computing and entering the profits in his cash book. Such omission resulted in a $5,531.03 understatement of income in 1947, and in 1946 resulted in a $14,599.97 understatement. The defendant admitted that he gave his bookkeeper no specific instructions as to how to enter this five per cent mill discount. While defendant spent much of his time in Oregon, he made a number of trips to Minneapolis in 1946 and 1947. He was continually pressed for money, and it does not seem unreasonable to suppose that he was interested in his profit records. He knew that his bookkeeper was young and inexperienced, and that none of the other employees in Minneapolis was in a position to supervise the bookkeeping or offer any help. During this period he personally made the entry in connection with the Paul Canton cancellation.

Commissions of $1,911.01 and interest in the amount of $1,001.39 were not entered in the cash book or reflected in the 1947 return. Defendant's explanation is that he sent either his checks or at least the vouchers in cases where he needed to cash the checks to his office. However, he does not claim that he gave any specific directions that these items were to be entered in the cash book, or as to how they were to be handled. Defendant in his explanation of the foregoing omissions states that he was unable to give proper attention to his Minneapolis business because of his absence from Minneapolis and the terrific load placed upon him at Douglas.

Wiseley v. Commissioner, 6 Cir., 185 F.2d 263, and Lewis v. Commissioner, Docket No. 37335, decided by the Tax Court in April 1955, lend some support to defendant's contention that his preoccupation with other duties may negative willful or wrongful intent in failing to report his full income. Both of these cases were civil fraud cases, and in each the court concluded the fraud penalty should not be imposed. We agree with the court's statement in the Wiseley case to the effect that the fact that defendant was personally busy to the point of distraction is a vitally material factor in determining the issue of fraudulent intent. From the report of the Wiseley case it would appear that the defendant on his own initiative, before investigation, became aware of his understatement and employed auditors and filed amended returns. In any event we believe that each case must be determined upon its own facts. It is not impossible for an extremely busy person to be guilty of fraudulent conduct. The record of defendant's business pressure was before the jury for such consideration as they thought it was entitled to. The jury were specifically told that to convict they must find that the defendant willfully and knowingly attempted to evade the tax. The trial judge who presided over this trial and had an opportunity to hear and observe all the witnesses, in his memorandum opinion not officially reported, stated:

"My sustained conviction is that there was a question for the jury as to whether there was an understatement by defendant of his 1947 income tax. The more difficult question is whether the evidence beyond a reasonable doubt sustained an intent to evade. On a motion for judgment of acquittal, the Court must take the view of the evidence and the inferences to be drawn therefrom which is most favorable to the Government, and although the Court might have arrived at a different interpretation of the evidence as to intent than is reflected in the jury's verdict, I cannot say that reasonable minds might not have concluded in considering all the evidence, direct and circumstantial, that defendant's guilt had been proven beyond a reasonable doubt. The Court was meticulously careful to surround the defendant with every protection to which he was entitled under the law, and particular emphasis was placed upon the burden which rested upon the Government with reference to intent."

We agree with and adopt the foregoing statement.

(3) The defendant next contends that even if the Government has established a substantial understatement with intent to evade, the conviction can not be sustained because of failure to prove beyond a reasonable doubt an overt act reflecting willfulness. In supplement to the defendant's brief it is stated that the defendant did not sign the 1947 return and that consequently the instrument purporting to be a return is not a return at all. He relies upon Miller v. Commissioner, Docket No. 43633, decided by the Tax Court on April 29, 1955. Defendant's counsel contend that they and the defendant overlooked the fact that the defendant had not signed the return until the return was produced at the trial, and that they were caught by surprise and overlooked legal implications arising from this situation. They asked that we note plain error pursuant to Rule 52(b) of the Rules of Criminal Procedure, 18 U.S.C.A.

The factual situation is that the 1947 return was signed in defendant's name by his wife. The return is dated March 15, 1948. There is no express evidence of any direct authorization for the wife to sign the return, nor is there direct evidence to show that she was not authorized to do so. The wife was authorized to sign checks drawn on the defendant's account. Mrs. Canton testified that Mr. Holl, who prepared the 1947 return, came to the house for the cash book, and later came back to her with the completed return. There is nothing to show the wife arranged with Holl to prepare the return, so it would seem fair to as-

sume that Holl did so either upon the request of defendant or as the result of the long-standing arrangement that Holl was to prepare defendant's returns. Defendant in his numerous visits with the investigators never denied signing or filing the return. The 1946 return was signed by Tanea Canton under similar circumstances.

A contention similar to that made by the defendant was made in Gariepy v. United States, 6 Cir., 220 F.2d 252. There the questioned returns were not signed by the taxpayer but were prepared by a tax service from information furnished by the defendant and his employees. This problem is rather fully discussed, the court saying in part at pages 259–260:

"Appellant argues that the 'purported' returns did not constitute income tax returns under the law; that the filing of the unsigned documents did not constitute the commission of an affirmative act requisite to sustain conviction under section 145(b). We think this contention runs contrary to the holding of this court in Emmich v. United States, 6 Cir., 298 F. 5, 9, where it was said: 'The real character of the offense lies, not in the failure to file a return, or in the filing of a false return, but rather in the attempt to defraud the government by evading the tax.' The specious contention of appellant comes rather late. At the trial, he did not deny that the documents filed with the Collector of Internal Revenue on his behalf were in fact income tax returns. * * *"

See also United States v. Albanese, 2 Cir., 224 F.2d 879, 882.

In this case the court instructed the jury:

"It appears that Mrs. Canton signed the 1947 income tax return. She signed her husband's name. It is not contended that she did not have authority from defendant to sign this return, so it is conceded that the return, Government's Exhibit 1, constitutes defendant's in-come tax return regardless of the fact that he did not sign it. However, the fact that he was not present when the income tax return was prepared by Mr. Holl, and that he was not present when his wife signed it, is a matter that you may give due consideration to insofar as it may bear upon the question of his alleged intent to wilfully and intentionally commit the offense charged in this information."

Defendant did not except to this instruction. Although the defendant requested certain instructions, he made no request for any instruction on the significance of his failure to sign the return. Under the record here made the jury were justified in finding that the defendant filed or authorized the filing of his return. The filing of the fraudulent return constitutes the required affirmative or overt act. In Cave v. United States, 8 Cir., 159 F.2d 464, 467, this court states:

" * * * The crime denounced by § 145(b) of willfully attempting to defeat or evade the tax is complete when the taxpayer willfully and knowingly files a false and fraudulent return with intent to defeat or evade any part of the tax due the United States. Guzik v. United States, 7 Cir., 54 F.2d 618, 619, certiorari denied 285 U.S. 545, 52 S.Ct. 395, 76 L.Ed. 937; Bowles v. United States, 4 Cir., 73 F.2d 772, 774."

If the purported return can not be technically considered a return, it would seem that it constitutes a false statement. A willful attempt to evade taxes by making a false statement violates section 145(b). United States v. Beacon Brass Co., 344 U.S. 43, 73 S.Ct. 77, 97 L.Ed. 61. In Spies v. United States, 317 U.S. 492, 63 S.Ct. 364, 87 L.Ed. 418, relied on by defendant, there was a failure to file a return and pay the tax. The Court holds that these omissions alone would not constitute the 145(b) felony. The Court then goes on to say, 317 U.S. at page 499, 63 S.Ct. at page 368:

" * * * Willful but passive neglect of the statutory duty may con-

stitute the lesser offense, but to combine with it a willful and positive attempt to evade tax in any manner or to defeat it by any means lifts the offense to the degree of felony.

"Congress did not define or limit the methods by which a willful attempt to defeat and evade might be accomplished and perhaps did not define lest its effort to do so result in some unexpected limitation. Nor would we by definition constrict the scope of the Congressional provision that it may be accomplished 'in any manner'. By way of illustration, and not by way of limitation, we would think affirmative willful attempt may be inferred from conduct such as keeping a double set of books, making false entries or alterations, or false invoices or documents, destruction of books or records, concealment of assets or covering up sources of income, handling of one's affairs to avoid making the records usual in transactions of the kind, and any conduct, the likely effect of which would be to mislead or to conceal. * * * "

See also Hoyer v. United States, 8 Cir., 223 F.2d 134; Banks v. United States, 8 Cir., 204 F.2d 666, remanded 348 U.S. 905, 75 S.Ct. 311, reaffirmed, 8 Cir., 223 F.2d 884. In Holland v. United States, 348 U.S. 121, at page 139, 75 S.Ct. 127, at page 137, the Court said:

"A final element necessary for conviction is willfulness. The petitioners contend that willfulness 'involves a specific intent which must be proven by independent evidence and which cannot be inferred from the mere understatement of income.' This is a fair statement of the rule. Here, however, there was evidence of a consistent pattern of underreporting large amounts of income, and of the failure on petitioners' part to include all of their income in their books and records. Since, on proper submission, the jury could have found that these acts supported an inference of willfulness, their ver-

dict must stand. Spies v. United States, supra, 317 U.S. at pages 499–500, 63 S.Ct. 368."

Under the record in this case the jury could find a consistent pattern in failing to record and report the profits arising from the two per cent discount situation, the additional five per cent mill discount, and commissions, and also the similar omissions that occurred in 1946. Defendant's accountant admitted that the understatement of income for 1946 was $29,927.20. While on the record here made a jury could readily have arrived at a verdict for the defendant, viewing the evidence in the light most favorable to the Government as we are required to do, we can not say that the verdict is without evidentiary support. The motion made at the close of the evidence and defendant's motion for judgment notwithstanding the verdict were both properly overruled.

■■■ (4) Defendant next contends that the court erred in permitting the Government to resort to circumstantial methods of proving understatement of net income. This case was tried before the Supreme Court decided Holland v. United States, supra. The Holland decision makes it clear that the net worth method may be used even in cases where the taxpayer's books are not shown to be inadequate, the Court stating, 348 U. S. at pages 131–132, 75 S.Ct. at page 133:

"* * * Petitioners' accounting system was appropriate for their business purposes; and, admittedly, the Government did not detect any specific false entries therein. Nevertheless, if we believe the Government's evidence, as the jury did, we must conclude that the defendants' books were more consistent than truthful, and that many items of income had disappeared before they had even reached the recording stage. Certainly Congress never intended to make § 41 a set of blinders which prevents the Government from looking beyond the self-serving declarations in a taxpayer's books. 'The United States has relied for the

collection of its income tax largely upon the taxpayer's own disclosures \* \* \*. This system can function successfully only if those within and near taxable income keep and render true accounts.' Spies v. United States, 317 U.S. 495, 63 S.Ct. 366. To protect the revenue from those who do not 'render true accounts', the Government must be free to use all legal evidence available to it in determining whether the story told by the taxpayer's books accurately reflects his financial history."

Defendant contends that in any event the circumstantial methods of proof here used do not establish an understatement of net income. The defendant's return listed net income of $26,105.99. Admitted specific omissions total $8,931.66, to which the jury would be justified in adding the $10,000 Paul Canton item, making a total taxable income of $45,037.65, from which the jury were authorized to deduct such part of the $11,658.40 in miscellaneous expenses as they considered allowable under the court's instructions. On the bank deposit method, including the Paul Canton item, Government Exhibit 105 shows net income of $50,743.72, and Exhibit 56 purports to show an increase in net worth of $29,449.53. Authenticity of these computations is contested by defendant. As to the bank deposit method there is much confusion as to whether the defendant's reports were on the cash or accrual basis. Mr. Holl who prepared the returns thought that he was preparing them on the cash basis, and some of the earlier returns showed on their face that the reports were on the cash basis, and the evidence is that the defendant was never given permission to change from a cash to an accrual basis. Likewise, there is considerable confusion and disagreement as to whether defendant's books were kept on the cash or accrual basis. The court in its instructions adopted the defendant's theory, and instructed that the defendant's books were kept on the accrual basis. In United States v. Burdick,

supra, 221 F.2d at pages 933, 934, the court said:

"We are of the opinion that the conviction under review is fully sustainable without resort to the net worth theory. This being the case, it would constitute a mere academic exercise to reconsider the net worth features of this appeal in the light of the authoritative guidance furnished by the Supreme Court with respect to net worth prosecutions.

\* \* \* \* \* \*

"It is apparent therefore, that the defendant was convicted for wilfully failing to report approximately $14,500 as taxable income. The receipt of these amounts was admitted. Their taxability was established by overwhelming evidence. Accordingly, the net worth computations introduced at the trial are without relevance to this appeal."

Similarly, in our present case we believe that the Government has established a case on the specific omissions admitted and proved, and that there was adequate proof of specific omissions to support the jury's finding of a substantial understatement.

(5) Under the record in this case we do not believe the defendant was as a matter of law entitled to deductions from gross income which the Government conceded were deductible for the purposes of its bank deposit method of proof. Our basis for reaching this conclusion is set out in division (1) of this opinion.

(6) Defendant finally contends that he was substantially prejudiced by the Government's arguments to the jury. To set out the argument objected to and to discuss the evidence upon which it was based would unduly extend this opinion without serving any useful purpose. In general it is charged that the Government counsel misinterpreted the evidence relative to instructions given by defendant to his bookkeeper, that counsel drew conclusions not supported by evidence from the bank deposit exhibits, and that improper allusion was made to defend-

ant's net worth appearing in the net worth statement. Objections were made to the argument. The trial court did not sustain the objections but noted exceptions, and in some instances told the jury that if a misstatement had been made the jury should disregard it. The trial court overruled the motion for a new trial which included the objections to the argument we are now considering. We have examined the arguments as a whole in the light of the evidence and find no prejudicial error.

The consideration of the whole record convinces us that the defendant had a fair trial. The court's instructions fairly submitted the issues to the jury. The trial court has committed no prejudicial error.

The judgment appealed from is affirmed.