**George Dewey STONEKING,**
Appellant,

v.

**UNITED STATES of America,**
Appellee.

No. 15417.

United States Court of Appeals
Eighth Circuit.

April 24, 1956.

Rehearing Denied May 28, 1956.

**386**

Daniel J. Leary, Joplin, Mo., for appellant.

Kenneth C. West, Asst. U. S. Atty., Kansas City, Mo. (Edward L. Scheufler, U. S. Atty., Kansas City, Mo., was with him on the brief), for appellee.

Before STONE, JOHNSEN and VOGEL, Circuit Judges.

VOGEL, Circuit Judge.

George Dewey Stoneking (appellant herein) and Paul Courtright and Earl Milton Vaughan were jointly indicted for bank robbery and conspiracy. Count No. 1 of the indictment charged that the three defendants on February 18, 1955, robbed the Citizens Bank of Carl Junction, Carl Junction, Missouri, the deposits of which were insured by the Federal Deposit Insurance Corporation, using force, violence and intimidation, and by putting in jeopardy the lives of bank employees through the use of a dangerous weapon, a .22 caliber pistol, and taking money from the bank, all in violation of Section 2113, Title 18 U.S.C.A.

Count No. 2 charged that between February 1, 1955, and February 18, 1955, the three defendants entered into a conspiracy to rob the bank, 18 U.S.C.A. § 371. Count No. 2 set forth five overt acts as implementations of the conspiracy.

Defendants Courtright and Vaughan entered pleas of guilty to the indictment. Stoneking entered a plea of not guilty, was tried before a jury and convicted. Courtright and Vaughan both testified in behalf of the prosecution at Stoneking's trial. Stoneking appeals to this court.

Viewed in the light most favorable to sustaining the verdict of the jury, Canton v. United States, 8 Cir., 1955, 226 F.2d 313, certiorari denied 350 U.S. 965, 76 S.Ct. 433; Christianson v. United States, 8 Cir., 1955, 226 F.2d 646, certiorari denied 76 S.Ct. 543, the evidence disclosed the following:

Stoneking, Courtright and Vaughan had known each other for many years. Some time in February, 1955, the three of them entered into a conspiracy to rob the Citizens Bank of Carl Junction, Missouri. On the morning of February 18, 1955, (a spur of the moment choice for the robbery) Courtright and Vaughan drove into Webb City, Missouri, where Vaughan was dropped off at a bar. Courtright, using Vaughan's car, went to Stoneking's home and asked him if he was ready to rob the bank. Stoneking said he would be in a few minutes. Courtright then drove to Vaughan's home and obtained a pistol which had been given to him by Stoneking the Sunday previous for use in the robbery, coveralls and a cap. He then returned

to Stoneking's house. Shortly thereafter Vaughan picked up Courtright at the bar and met Stoneking in the latter's car near the Webb City Library. Vaughan drove his car with Courtright as a passenger to a point on a gravel road two miles east of Carl Junction, where Courtright entered Stoneking's car and Vaughan's car was turned around. Stoneking drove Courtright to Carl Junction. En route, near the home of one Doris Moss, he stopped, went to the rear of the car and threw some mud over the license plate. The witness, however, did not actually identify Stoneking as the man who threw the mud.

Stoneking then drove Courtright around the block on which the bank was located and parked the car near the bank. Courtright walked into the bank carrying a loaded gun, executed the robbery, the details of which are unnecessary here, came out and got in Stoneking's car, which Stoneking drove east on Highway 57, and thence on to a gravel road where Courtright changed to Vaughan's car, Vaughan having been waiting for them. Courtright and Vaughan drove north on Highway 43, ultimately going to Vaughan's house, where they hid the money under a back porch. Vaughan and Courtright were arrested as they were leaving the house shortly afterward.

The two cars used by the defendants in the robbery and get-away were a light green Ford operated by Stoneking and Vaughan's blue Ford, to which Courtright had transferred after the robbery at the point on the gravel road east of Carl Junction, where Vaughan awaited them. Both cars, first Stoneking's car and then Vaughan's blue car, were followed by witnesses, who subsequently testified that the Stoneking car turned south at the intersection and the Vaughan car north.

Reuben Stone, one such witness, testified to following the cars to the intersection where the one car turned north and the other south. He testified:

"At that point from a distance of 18 to 20 feet I looked right in the eye of the man in the light green car. I identify the man as the defendant Stoneking in the courtroom."

On cross examination, Mr. Stone testified:

"When the fellow in the old car turned his head around at the intersection of 43 I saw him for a very short time, just a matter of seconds, I would say three seconds. At the preliminary hearing in the Magistrate Court of Jasper County before Judge Ray England I testified that the man turned his face 'for a fraction of a second.' I now recognize the discrepancy in my testimony. I saw the green car at the Webb City Jail on the night of February 18. I remember Mr. Stoneking being present at the preliminary hearing on March 2, 1955."

The Reverend Mr. Keith Bottles was another witness to the identity of the defendant Stoneking. He testified to having followed the Stoneking car and catching up with it traveling at speeds of 80 miles an hour or more. He stated:

"The green car stopped across the street from the front of the library in Webb City, and the man who got out of the green Ford at the library I identify in the court room. The man entered the library and stood outside the doors watching me, then the man went inside the library and I drove to the main part of Webb City and then back to the library, where I saw the green car still parked, and obtained the complete license number, H-33013. Mud had been smeared over the 'H' in the license plate. I had obtained the other digits of the license plates as I chased it across the country. The man left the library and I now know the man to be Dewey Stoneking, got into his Ford and went south, then west with me still following him. * * *"

On cross examination, Bottles testified:

"At the intersection of Highway 43 I could not identify Stoneking,

but I could identify Vaughan and Courtright, who were three cars ahead of me at that time. At that time it was misting. Courtright and Vaughan were within four or five car lengths ahead of me and as they turned north I could see both of them and identified them. I do not know from whence came the car that got between me and the light green car on the T. B. Hospital road. The green car was always in my vision until we reached the library. I did 80 miles an hour passing the car in front of me."

Richard W. Flack, a Special Agent of the F.B.I. Laboratory in Washington, D. C., testified regarding a scientific analysis and comparison of dirt or soil on the license plate of the Stoneking car and that taken from soil samples near where the car had stopped and someone was observed to have thrown mud on the license plate. Evidence was also introduced whereby the pistol used in the robbery of the bank was traced to the defendant Stoneking.

The appellant's first charge of error deals with the court's instructions to the jury. The more serious is concerned with the court's comments with reference to the witnesses Reuben Stone and the Rev. Mr. Bottles. As to the witness Reuben Stone, the court stated:

"You heard the witness Reuben Stone, who said that at the intersection of Highway 43 and this gravel road, as the defendant Stoneking looked around over his shoulder—some dispute about whether it was for one, two or three seconds; to my mind that is of no consequence at all—you can determine whether it is or not; I would say, no—he said, 'I looked him right in the eye and that is him.' If you believe that testimony is true, then the defendant Stoneking is guilty on the First Count.

"Now, then, who else? The Reverend Bottles says that he identifies, he recognizes and points out the defendant Stoneking as the driver of the Ford, as he followed the Ford. Now, if you find and believe that testimony is true, then, again, you would find the defendant Stoneking guilty."

Appellant argues that the court's statement was, in effect, a direction to find the defendant guilty solely upon the testimony of the witness Stone that he saw and identified him at the intersection of Highway 43 or upon the identification of the witness Bottles and that it ignores the defendant's testimony regarding an alibi. It should be noted, however, that immediately after instructing the jury as above, the court stated:

"Of course, on each of these Counts you have to find, however, that he was a principal; that he 'aided, counseled, abetted or induced' the commission of the holdup of the Bank of Carl Junction.

"Is he otherwise identified? You may remember the testimony, of course, of Courtright and of Vaughan. They have pleaded guilty here, but they are witnesses in the case. They have told you in detail all of what happened and that Mr. Stoneking was a member of the group, and what his part in it was.

"The credibility of all of these witnesses, whether you believe them or not, is for you. If you believe them and believe that Stoneking—we are talking about the First Count now—did aid, counsel and abet with Courtright and/or Vaughan to go out to the Bank of Carl Junction to hold it up, and that in furtherance thereof drove his automobile out there, and from this point two and a half miles east of Carl Junction took Courtright with him, and that they did go into Carl Junction for the purpose of having Courtright go into the Bank and get the money out of the Bank by the use of firearms—and he did so—and that Stoneking was waiting for him, and when Courtright came out and got in the Stoneking automobile

they headed on back toward the east with the money, if you believe that evidence to be true, then you would find the defendant Stoneking guilty."

■■ In considering the effect of a challenged portion of a court's instruction to the jury, this court must view the charge in its entirety to determine whether or not the jury could have been misled by the portions to which objection has been made. Myers v. United States, 8 Cir., 1927, 18 F.2d 529, 530. So here, if we view only the particular portions of the charge objected to, fault might be found; but when viewed in the light of the court's remarks which immediately followed the objected-to portions, we find no reason for criticism, and must conclude that the jury was not confused by the instruction and that taken as a whole it was not improper.

In Hewitt v. United States, 8 Cir., 1940, 110 F.2d 1, 10, certiorari denied 310 U.S. 641, 60 S.Ct. 1089, 84 L.Ed. 1409, Judge John Sanborn, speaking for this court and in passing upon a somewhat similar charge by the trial court, stated:

"The instruction challenged by the defendant did nothing more than advise the jury that if they found the facts to be as testified to by the government's witnesses, the defendant was guilty under the law. That was an accurate and correct statement, and was entirely justified. It did not invade the province of the jury. The credibility of the witnesses and the weight of evidence was left to the jury's determination. Compare Horning v. District of Columbia, 254 U.S. 135, 137, 138, 41 S.Ct. 53, 65 L.Ed. 185."

■ Appellant also complains of other portions of the trial court's charge to the jury wherein the court commented in detail on the evidence introduced and on some occasions expressed his own opinion in regard thereto. When a trial judge feels it necessary to comment in detail about the evidence introduced in a criminal trial, he must exercise complete fairness and impartiality and avoid in any sense the advocate's right of argument. If a trial court sees fit on the one hand to comment in detail on the evidence introduced by the prosecution, he must, on the other hand, comment in detail with reference to the evidence introduced in behalf of the defense. If he sees fit to express opinions, he must avoid advocacy or argument in such expression and must meticulously point out to the jury that such opinions as he may have expressed are in no way binding upon the jurors and that they are the sole arbiters of all fact questions.

This court stated the rule in Cook v. United States, 8 Cir., 1927, 18 F.2d 50, 52:

"These cases cannot all be harmonized, but we think the line of demarcation between what a court may say to the jury in a criminal case in expressing his opinion on the facts, and what he may not say, is to be drawn between mere expression of opinion not partaking of such argumentative nature as to amount to advocacy, leaving to the jury absolute freedom to determine the facts, and such discussion as amounts to an argument and makes the court in fact an advocate against the defendant. A trial judge is not merely a moderator or umpire; neither is he an advocate.

"The argumentative nature of the part of the instructions objected to (hereinbefore set out) is apparent, and in our judgment the language amounted to an argument for the conviction of the defendant. The court did tell the jury that his opinion on the facts was not controlling upon them, but that did not in our judgment cure the error. Every one knows that suggestions from the court have great weight with a jury, and the argumentative language used in this instruction must have seemed to the jury an advocacy of the government's case, and impressed upon them the court's desire for a conviction. We think it

was not such judicial discussion of the evidence as is permissible. Certainly the language is as argumentative as that used by the court in the case of Cook v. United States, 8 Cir., 14 F.2d 833, which this court decided necessitated a reversal of the case."

See also Boatright v. United States, 8 Cir., 1939, 105 F.2d 737, 740; Spalitto v. United States, 8 Cir., 1930, 39 F.2d 782, 788; McCoy v. Blakely, 8 Cir., 1954, 217 F.2d 227, 233. In this case, the court's remarks did not amount to argument or advocacy, they were fairly stated and not overemphasized on one side or the other. The trial court very carefully left for the jury the determination of all disputed questions of fact. Before his comments on the evidence, he stated:

"What I am about to say, in my review of the evidence before you, is not binding upon you because you are the sole judges of what the evidence was, and if your recollection differs from mine, you, of course, will be governed by your recollection, not mine."

In regard to the defense of an alibi on the part of the defendant, the trial court stated:

"Now, he says it is not so. That is on the First Count. He says it is not so. He says that. He offers witnesses here to say that he was in the Library in Webb City, or was paying his water bill.

"Then Mrs. Ferguson was put on the stand. Your recollection of the testimony is what is controlling on that. My recollection of the testimony of Luther Atterbury and his wife is that Mr. Stoneking came there about 11:40 in the morning. That is the first time. He came back later that day when Mrs. Baldridge was there and she fixes the time at about, my notes show, 12:45 p. m. that day.

"I do not see any conflict in the evidence here that would amount to an alibi, because that is corroborated by the testimony of the Reverend Bottles and was consistent, at least, with the time when the Bank hold-up occurred. So it is for you to determine whether or not that constitutes an inconsistency with the Government's evidence, or is an alibi."

He then explained further the testimony in behalf of the defendant, again referring to the fact that the question of the truth or falsity of such testimony was for the jury. Continuously through the entire charge the trial court, in reviewing the evidence, referred again and again to the fact that it was up to the jury to determine what the facts were.

At the conclusion of the court's comments with reference to the evidence on both sides and his instructions regarding the law and just before submitting the case to the jury, he stated as follows:

"Now, all these facts are for your determination. I do not mean to assume as true, or established any fact whatever concerning which I have talked about, or to which I have made reference. What I have done is attempt to review the evidence before you for such aid and enlightenment as it can be, and I tried to do it in as an impartial a manner as I know how. The resolution of the questions of fact is all for you."

█ We have carefully reviewed the entire charge and the objections thereto. We are of the opinion that it fairly presented a summary of the testimony and, while expressing opinion on some evidentiary points, the trial court carefully left for the jury all fact determinations, pointedly making clear that such fact determinations were for the jury and the jury alone. We find no error in the instructions as given.

Appellant's second point is that the court erred in failing to give the appellant's second requested instruction, which was as follows:

"The Court instructs the jury that the testimony of parties aiding, assisting, encouraging, and abetting the crime is admissible; yet their

evidence when not corroborated by the testimony of others not implicated in the crime, as to matters material to the issue, ought to be received with great caution by the jury, and they ought to be fully satisfied of its truth before they should convict the defendant on such testimony."

On this point the record indicates that subsequent to the court's general charge to the jury, the following occurred:

"Mr. Leary: (Attorney for appellant) And I think one point, Your Honor, you may have—I cannot say you did or didn't—failed to mention, and that is whether or not the testimony of Courtright and Vaughan needed corroboration. I have forgotten whether you mentioned that or not.

"The Court: I mentioned it on conspiracy but only on conspiracy.

"Mr. Leary: Well, if you did mention it, all right; if you did not, I would object to the failure to mention it. I have nothing further.

"The Court: All right. The objections are noted."

The court had given an adequate instruction covering the credibility of witnesses in general but had failed to give defendant's Requested Instruction No. 2, supra, or refer in any way to the caution with which an accomplice's testimony should be received where it is not corroborated. Appellant relies on a case from this court, McLendon v. United States, 8 Cir., 1927, 19 F.2d 465. Quoting from page 465 of 19 F.2d:

"One of the alleged errors in the trial of the case was that the judge declined to instruct the jury as to the testimony of R. C. Smith, a witness for the United States, as the testimony of an accomplice of the defendant."

Page 466 of 19 F.2d:

"The evidence in this case so strongly tended to prove that this witness Smith was an accessory and an accomplice of the defendant in the conception and commission of the offense alleged in the indictment in this case that we are unable to resist the conclusion that the court's failure to instruct the jury regarding this issue, and its failure to instruct them with what caution they should consider his testimony, if they concluded he was such an accomplice, was an error which deprived the defendant of a substantial right in his trial."

It will be noted, first, that in the McLendon case, the witness Smith was not named as a defendant or an accomplice, yet the evidence strongly indicated that he was an accessory before the fact. The jury should have been allowed to determine that issue and instructed that if they found Smith was an accessory before the fact, then, in law, he was an accomplice in relation to his testimony, which should be received with caution where uncorroborated. We have no such situation in the instant case.

■ Our situation is more comparable to that confronting the court in United States v. Bucur, 7 Cir., 1952, 194 F.2d 297, 305:

"Defendant also argues that the trial court erred in refusing to instruct the jury as to the weight to be assigned to accomplice testimony. Although such an instruction is the 'better practice,' it is not error to refuse to give it. Caminetti v. United States, 242 U.S. 470, 495, 37 S.Ct. 192, 61 L.Ed. 442; Wallace v. United States, 7 Cir., 243 F. 300. This is particularly true in the light of the fact that the jury was clearly advised that the witness Minich was in fact one of the alleged coconspirators. Thus, it was proper for the court to allow the jury to draw its own conclusions as to the weight to be assigned to his testimony."

This court stated the general rule in Greenberg v. United States, 8 Cir., 1924, 297 F. 45, 47:

"While it is the better practice in a criminal prosecution to give an instruction cautioning the jury against too much reliance on the testimony of an accomplice, the failure to give such an instruction is not reversible error, and there is no absolute rule of law preventing conviction on such testimony. Caminetti v. United States, 242 U.S. 470, 495, 37 S.Ct. 192, 61 L.Ed. 442, L.R.A.1917F, 502, Ann.Cas.1917B, 1168; Diggs v. United States, 9 Cir., 220 F. 545, 552, 136 C.C.A. 147; Wagman v. United States, 8 Cir., 269 F. 568, 571; Wallace v. United States, 7 Cir., 243 F. 300, 307, 156 C.C.A. 80; Richardson v. United States, 3 Cir., 181 F. 1, 9, 104 C.C.A. 69; Rachmil v. United States, 2 Cir., 288 F. 782, 785; Graboyes v. United States, 3 Cir., 250 F. 793, 794, 163 C.C.A. 125; Tuckerman v. United States, 6 Cir., 291 F. 958, 963; Reeder v. United States, 8 Cir., 262 F. 36, 42."

Here there could have been no question in the jurors' minds as to the status of the witnesses Courtright and Vaughan. They were named co-defendants in the indictment. They had entered pleas of guilty. They testified as to the conspiracy, the actual robbery of the bank and Stoneking's part therein. As to their testimony, the trial court stated:

"You may remember the testimony, of course, of Courtright and of Vaughan. They have pleaded guilty here, but they are witnesses in the case. They have told you in detail all of what happened and that Mr. Stoneking was a member of the group, and what his part in it was.

"The credibility of all of these witnesses, whether you believe them or not, is for you. * * *"

■ There is another, very cogent reason why failure to give defendant's second requested instruction was not error in this particular case. It is, of course, the better practice to give the instruction where the testimony of the accomplices lacks corroboration, but in the instant case we think there was substantial corroboration of the testimony of the two accomplices. We refer to the identifying testimony of the witnesses Stone and Bottles and also to the fact that the gun used in the robbery was traced directly to the defendant Stoneking. The testimony of Courtright and Vaughan regarding their activities before and at the time of the robbery was corroborated in other respects by various witnesses. We find no error in connection with appellant's second point.

Appellant's third point is that the court erred in failing to require the witness Flack to answer directly defense counsel's question as to whether or not the dirt samples did or did not come from the specific area near the Moss home. Referring to the samples, one taken from the license plate on Stoneking's car and the other from the spot where someone picked up soil and threw it on the license plate, the witness testified on direct examination:

"A. I find they could have come from this area represented by the specimens I examined. I would consider it unlikely they came from any other area and I found no differences to indicate that they did."

On cross examination, the following occurred:

"Q. Now, Mr. Flack, let me ask you a blunt, straight-forward question: did they come from the same area? A. No. I said that they could have come from that area and that it is unlikely that they came from another area.

"Q. I am asking you a straight-forward, blunt, frank question. I am not asking you a probability nor a possibility. I am asking you, as

a matter of fact, did they come from that area? A. I think I answered the question.

"Q. Will you answer the question I am asking you, please? A. Yes, sir.

"Q. Did they come from that area? A. They could have come from that area."

Appellant's counsel then asked the trial court to direct the witness to answer whether or not the samples came from that area. The trial court refused to so direct but asked the witness if he could say whether or not the samples came from the same place. In answer to the court's question, the witness stated:

"A. If they were different I could say definitely that they did not come from the same area. Since they are alike I can say that they could have come from the same area. Well, due to the various similarities it is unlikely that it came from another area."

We think the trial court was entirely correct in refusing counsel's request and that it would have been improper to direct the witness to answer a question which he obviously could not answer. The witness said that the samples could have come from the same area and that it was unlikely that they came from different areas. He could not, of course, say with definiteness that they did come from the same area. The samples were alike. Had they been different, the witness could have made the definite statement that they did not come from the same area; but being alike, he could only say that they could have come from the same area and that it was unlikely that they came from different areas. We find no error in the appellant's third point.

An examination of the record, including the court's entire charge, convinces us that the defendant had a fair trial.

Affirmed.