Comer BLOCKER, Appellant,

v.

UNITED STATES of America, Appellee.

No. 15777.

United States Court of Appeals District of Columbia Circuit.

Argued Nov. 16, 1960.

Decided March 3, 1961.

Wilbur K. Miller, Chief Judge, and Bastian, Circuit Judge, dissented.

Mr. J. William Doolittle, Jr., Washington, D. C. (appointed by this court), with whom Mr. E. Lewis Ferrell, Washington, D. C. (appointed by the District Court), was on the brief, for appellant. Mr. James W. Davis, who was appointed by the District Court, was on the brief for appellant but entered government service and withdrew as counsel before the argument.

Mr. Nathan J. Paulson, Asst. U. S. Atty., with whom Messrs. Oliver Gasch, U. S. Atty., and Carl W. Belcher, Asst. U. S. Atty., were on the brief, for appellee.

Before WILBUR K. MILLER, Chief Judge, and EDGERTON, PRETTYMAN, BAZELON, FAHY, WASHINGTON, DANAHER, BASTIAN, and BURGER, Circuit Judges, sitting in banc.

EDGERTON, Circuit Judge.

We reversed appellant's former conviction of first degree murder. Blocker v. United States, 107 U.S.App.D.C. 63, 274 F.2d 572. He now appeals from another conviction and sentence of death for the same crime. There was substantial evidence that he was, and substantial evidence that he was not, insane at the time of the offense.

In 1895 the Supreme Court ruled that "if the whole evidence, including that supplied by the presumption of sanity, does not exclude beyond reasonable doubt the hypothesis of insanity, of which some proof is adduced, the accused is entitled to an acquittal * * *." Davis v. United States, 160 U.S. 469, 488, 16 S.Ct. 353, 358, 40 L.Ed. 499. That case has been law for 65 years. In the last 10 years we have applied it many times.

In 1951 we said: "the function of the trial court in regard to the issue of sanity

ments," Lawrence v. Shaw, 1937, 300 U.S. 245, 250, 57 S.Ct. 443, 81 L.Ed. 623.

is to determine whether that issue is brought into the case by evidence. If it is, then it should be submitted to the jury with instructions that if the jury has a reasonable doubt of the defendant's sanity, there must be an acquittal." Tatum v. United States, 88 U.S.App.D.C. 386, 390, 190 F.2d 612, 616.

In 1954 we said: "Whenever there is 'some evidence' that the accused suffered from a diseased or defective mental condition at the time the unlawful act was committed, the trial court * * * should in some way convey to the jury the sense and substance of the following: * * * Unless you believe beyond a reasonable doubt either that he was not suffering from a diseased or defective mental condition, or that the act was not the product of such abnormality, you must find the accused not guilty by reason of insanity. * * *" Durham v. United States, 94 U.S.App.D.C. 228, 241, 214 F.2d 862, 875, 45 A.L.R.2d 1430.

In 1956 we said: "There was evidence * * * that the accused was of unsound mind when the robberies occurred. The prosecution therefore was under the necessity of establishing to the satisfaction of the jury beyond a reasonable doubt that the robberies were not the result of Douglas' insanity. * * * Restating the matter within the rule prevailing in this jurisdiction since Durham v. United States, * * * in order to justify a conviction the proof, considered with the presumption of sanity, must exclude beyond a reasonable doubt the hypothesis that the conduct indicted was the product of a diseased mind." Douglas v. United States, 99 U.S.App.D.C. 232, 235, 239 F. 2d 52, 55.

In 1957 we said: "when the defendant introduces some evidence to raise the issue of insanity, his sanity at the time of the offense becomes an element of the crime, which, like all other elements of the crime, must be proved by the Government beyond a reasonable doubt."

Wright v. United States, 102 U.S.App. D.C. 36, 39, 250 F.2d 4, 7.

Again we said in 1957: "When the issue of insanity is properly raised by evidence, as it was in this case, the burden is on the Government to prove * * beyond a reasonable doubt either (1) that the accused had no mental disease or defect or (2) that, although the accused was defective or diseased, his act was not the product of the affliction." Carter v. United States, 102 U.S.App.D.C. 227, 233, 234, 252 F.2d 608, 614, 615.

We said this again in 1959. Hopkins v. United States, 107 U.S.App.D.C. 126, 128, 275 F.2d 155, 157.

On January 21, 1960, we said: "the law in all federal jurisdictions, under a Supreme Court ruling, is and has been for more than half a century that, when a defendant in a criminal case introduces enough evidence of insanity to overcome the presumption of sanity, a burden thereupon falls upon the Government to establish sanity beyond a reasonable doubt." Isaac v. United States, 109 U.S. App.D.C. 34, 284 F.2d 168, 170.

Although these many cases made it uncommonly plain that the burden of proof on the issue of Blocker's insanity was on the government, the prosecutor asked the court to place the burden on the defendant. His Proposed Instruction No. VI said: "In order for you to find the defendant not guilty by reason of insanity, you must find: (1) that at the time of the offense(s) the defendant was suffering from some mental disease or defect; AND (2) that the act(s) in question * * * was (were) the product of such mental disease or defect. * * * In order for you to acquit on the ground of insanity, you must find *both* these elements present. It is not sufficient for you to find merely that the defendant was suffering from a diseased or defective mental condition when he committed the offense. You must further find that the act was the product of the mental abnormality." [1]

---

1. Except for the unimportant word "further", the last two quoted sentences of the proposed instruction are the very words of the instruction we had disapproved in Carter, supra.

After thus contradicting the law, the proposed instruction contradicted itself. It said: "However, if there is some evidence of mental disorder, the burden is on the Government to prove beyond a reasonable doubt that at the time in question the defendant was of sound mind. * * * If you should find all the elements of the offense have been proved, but you have a reasonable doubt as to both his mental condition and the causal relation of such mental condition to the offense charged, then you would find the defendant not guilty by reason of insanity."

The net result of the proposed instruction was confusion. The burden was on the defendant; the burden was on the government.

The court granted the proposed instruction "in substance". It first charged the jury in accordance with the law; then in contravention of the law; and finally, once more in accordance with the law:

(1) "Basically, there is a presumption that all people are sane. * * * But, when there is some evidence of a mental disorder, as here in this case, then the presumption of sanity of the individual, Comer Blocker, vanishes from the case. And the burden is upon the Government to prove beyond a reasonable doubt that at the time in question, April 5th, 1957, the defendant, Comer Blocker, was of sound mind, or if he suffered from a mental disease or defect, at the time of the offense, that is, the killing of Frances Hall, that the act was not caused by the mental disease or defect, just as the burden is on the Government to prove beyond a reasonable doubt all of the other essential elements * * * that is, malice, premeditation, deliberation, the same burden is on the Government to prove the sanity of Comer Blocker on April 5th, 1957, or that if he was suffering from a mental illness on that date, that it was not the causal effect (sic) of the killing of Frances Hall. * * * "

Assuming "causal effect" was meant for "effective cause", the foregoing part of the court's instruction is correct. It places the burden of proof where the law places it, squarely on the government.

But the court went on to give a contrary instruction:

(2) "Now, a person is relieved of the responsibility for a crime by reason of insanity, *where it is found, first, that he was suffering from a mental defect or a mental disease* at the time of the offense, *and, second, that his act was the product* of that mental defect or disease. * * * Now, you are instructed that if you find that the defendant, Comer Blocker, committed the act complained of, that is, the shooting of Frances B. Hall on April 5th, 1957, while he was suffering from a mental disease or defect, then you must consider the second requirement spoken of before you may find him not guilty by reason of insanity. * * * Turning then to the shooting * * * if your answer to the first requirement is yes, the defendant, Comer Blocker, was suffering from a mental disease or defect, and if you find that the defendant, Comer Blocker, did in fact commit such acts, then *you must find that it resulted from or was produced by* the unsoundness, or by *the mental illness* * * *. Now, *if you find that then you may find the defendant,* Comer Blocker, *not guilty by reason of insanity.*" (Emphasis added.)

This part of the instruction is plainly erroneous. The words "where it is found", "you must find" and "if you find" informed the jury that the burden of convincing them—which is the burden of proof—was on the defendant.

Finally, the court went on to place the burden, as it had at first, on the government:

(3) "And if you should find the Government has proved all of the elements of either first or second-degree murder but you have a reasonable doubt as to whether the offense was the result of a mental disease or defect existing in the defendant at the time he committed the offense, then you must find the defendant not guilty by reason of insanity. If, however, you should find that the Government has proven either first or second-

degree murder, and has also proved beyond a reasonable doubt either that the defendant was of sound mind at the time of the offense, or that the act was not caused by any mental disease or defect from which the defendant may have been suffering on that date, that is, April 5th, 1957, * * * you may find the defendant guilty of such offense. Now, ladies and gentlemen, it should be crystal clear to you that when some evidence is introduced to you the presumption of sanity disappears and the responsibility from that point on is on the Government. It is not a responsibility which is on the defendant to prove any mental illness or that the mental illness was the causal effect [effective cause?] or was the motivating force behind the act in question. Those are responsibilities for the Government."

We have considered the erroneous instruction, which we have numbered (2), in its context. We have placed it where the District Judge placed it, between the two correct instructions which we have numbered (1) and (3). We have endeavored to omit nothing that might be thought to have any tendency to reduce the effect of the erroneous instruction. Perhaps the jurors were more likely to act on the correct instructions than on the incorrect one. But we cannot be certain that any juror did so. We think it unlikely that every juror did so. We think it not unlikely that some jurors voted to convict Blocker because (a) they could not decide whether his act was or was not the product of mental illness and (b) the judge had told them they "must find" the act *was* produced by mental illness if they were to acquit him on the ground of insanity. We see no reason to assume the jury found that Blocker had no mental disease or defect, or found that no such abnormality produced the act.

As we said on January 21, 1960, regarding the charge to the jury in the Isaac case, supra: "The statements to the effect that in order to render a verdict of not guilty by reason of insanity the jury * * * must find that the accused suffered from a mental disease and that his acts were the product of the disease, were erroneous. Those statements ignored the burden which was on the prosecution under the Davis case. It is true that the court correctly stated to the jury several times that the burden of proof was on the Government to establish beyond a reasonable doubt that the accused was not suffering from a mental disease or that the acts were not the product of a mental disease. The two conflicting views of the law, the erroneous and the correct, as to the burden of proof were repeated several times in this charge. We cannot speculate that the correct statements obliterated in the minds of the jurors the repeated erroneous statements. We recognize that the problems posed by the burden-of-proof rule in respect to the defense of insanity are somewhat difficult, but the rule of law is plain and absolutely certain. It should be made plain and certain to juries in such cases." 109 U.S.App.D.C. at page 37, 284 F.2d at page 171.

Wright v. United States, 102 U.S.App. D.C. 36, 43, 250 F.2d 4, 11, and Carter v. United States, 102 U.S.App.D.C. 227, 233, 252 F.2d 608, 614, are to similar effect.

Because this is a capital case, it is especially important to avoid the confusion which the court's self-contradictory instructions may have created in the minds of at least some of the members of the jury.

We think the authorities we have cited make it clear that the conviction must be reversed and the case remanded to the District Court for further proceedings consistent with this opinion.

Appellant's court-appointed counsel has expressed deep concern that certain practices in the administration of the rule of criminal responsibility which this court adopted in 1954 endanger its broadened purposes. In dealing with these matters in a number of previous cases, we have expressed similar concern. We think the present case does not present a useful context for further discussion of these matters.

PRETTYMAN, BAZELON, FAHY, WASHINGTON, and DANAHER, Circuit Judges, concur in this opinion.

Reversed and remanded.

BURGER, Circuit Judge (concurring in the result only).

In my view we should reverse on the grounds urged by appellant's very able brief with respect to the mechanical and restrictive aspects of the "disease-defect-product" [1] test for determining criminal responsibility. This would require that we modify the standard of criminal responsibility adopted by us in 1954 [2] from the New Hampshire rule of 1869.[3]

Since its adoption in 1954, the "disease-product" test has been both acclaimed [4] and criticized; it has been called "vague," "confusing," "ambiguous," "misleading," and it has been condemned as taking the fact determination away from jurors and transferring it to experts.[5] Curiously it has even been at-

1. "Disease" as hereafter used is intended to include "defect."

2. Durham v. United States, 1954, 94 U.S. App.D.C. 228, 214 F.2d 862, 874.

3. The rule we adopted in 1954 was "that an accused is not criminally responsible *if his unlawful act was the product of mental disease or mental defect.*" Compare State v. Pike, 1870, 49 N.H. 399, 402, where the rule is "the verdict should be 'not guilty by reason of insanity' *if the [unlawful act] was the offspring or product of mental disease * * *.*" Some commentators emphasize that while the 1869 rule and our 1954 rule are virtually identical in language, they differ in that New Hampshire cast its rule as one of evidence governing the scope of evidence to be received while Durham lays down a rule of law. Reid, Understanding The New Hampshire Doctrine of Criminal Insanity, 69 Yale L.J. 367, 371, 389–91 (1960). Similarly the so called "right and wrong" test is not the same as the M'Naghten test.

4. E. g. Zilboorg, A Step Towards Enlightened Justice, 22 U.Chi.L.Rev. 331 (1955).

5. Professor Mueller states: "The first part of M'Naughten is designed to determine [defendant's capacity for understanding the nature and consequences of the act charged]. The vague Durham test does not, and is, therefore, rightly rejected by most of our courts. * * * let us not be hasty about changing our law on capacity. Although psychiatry and neurology continue to make enormous advances, psychiatrists are likely to reverse themselves completely between fall and spring." 1959 Ann.Survey Am.L. 112–114.

Professor Wechsler in The Criteria of Criminal Responsibility, 22 U.Chi.L.Rev. 367, 373 (1955) observed "Durham then puts forth, in my opinion, a legal principle beclouded by a central ambiguity, both unexplained and unsupported by its basic rationale."

Judge L. Hand said: "I have read the [Durham] opinion * * * but, frankly, it did not seem to me to give us any guidance that perceptibly would help.

"The truth appears to me to be that the question goes to the heart of whatever we choose to make our purpose in criminal punishment. *It is only indirectly, or at second hand, a psychiatric question.*" (Emphasis added.) Letter from Judge L. Hand, 22 U.Chi.L.Rev. 319 (1955).

Professor Guttmacher viewed Durham hopefully but with reservations saying that while it "will be a vast improvement over the criteria of responsibility in common use, difficulties will still exist. * * * There will be uncertainty and differences of opinion as to what constitutes a 'diseased or defective mental condition.' And there will at times be doubt as to whether or not the act was the product of the existing mental abnormality." Guttmacher, The Psychiatrist As An Expert Witness, 22 U.Chi.L. Rev. 325, 327 (1955).

"The Durham court rejected the New Hampshire approach of refusing to rule that any particular overt condition or action was a manifestation of mental disease, and instead has ruled, as a matter of law, that knowledge of right and wrong, while no longer the test for mental disease, was a symptom of it. Thus the Durham judges refused to heed Doe's dictum that the law is not concerned with the correctness of any medical theory, and did the very thing for which they condemned the M'Naghten judges, transforming contemporary medical theory into judicial fact. As a result, the Durham court has not only offered definitions on questions which New Hampshire would leave to the jury, but, despite clearly stated intentions to the contrary, may also be said to have set itself up as the ultimate trier of facts,

tacked as "novel" by critics who overlooked its 1869 origins, and as "radical" by some who seemingly are unwilling to allow the same scope to medical testimony in a criminal case as we have allowed historically in civil cases, such as will contests where mental capacity is at issue.

As I see it, our Durham opinion was a wrong step but in the right direction; its direction was correct because, like Smith v. United States, 1929, 59 App. D.C. 144, 36 F.2d 548, 70 A.L.R. 654, it sought to open the jury's inquiry to include the expanding knowledge of the human mind and personality. The precise step—the "disease-product" test—is, however, subject to many valid criticisms which we must face. Among other things it tends to treat unsupported and dubious psychiatric theory as scientific knowledge. It is an example of exercising judicial power beyond judicial comprehension in an area where not even relative certainties are established. From ancient times the development of the law was always on the basic idea that man should be held criminally responsible for his voluntary acts resulting from the exercise of his will. While we have said this was our "basic postulate," [6] our "disease-product" instruction to the jury totally ignores will or choice. It is obvious, of course, that under a jury system the standard or "test" or "rule" of criminal responsibility is only what is given to the jury as an instruction. What we say in our opinions but withhold from the jury is meaningless except as it discloses the gap between the law as stated by this court and the law as applied by the jury.

# I

## Fallacies of Our Present Criminal Responsibility Standard

I agree with appellant's attack on the mechanical and restrictive "labelling" aspect of the "disease-product" test and I believe that we cannot escape from the dilemma created by that rule except by adopting some other alternative. Of necessity the whole of my reasons must be set forth at some length, since what I propose is that the entire background of this problem be reexamined and that the "disease-product" jury instruction be abandoned. We have devoted literally hundreds of pages in numerous opinions in our effort to explain and interpret what that rule means; not surprisingly it will require some space to review this history, to demonstrate the defects of the rule and to set forth possible alternatives.

Appellant's counsel has not made a direct attack on Durham, but rather couches his attack in terms of the manner in which the prosecution "used" and the court applied it. Without reaching the alleged errors in the charge on burden of proof, which were persuasive to the majority, I am satisfied that the District Judge applied our rule literally and scrupulously in allowing experts to express conclusory opinions in the same terms as the ultimate jury question. Our rule permits, and indeed rests upon the premise that psychiatrists may do precisely that.

Appellant's cogent attack on the "disease-product" concept is best stated in the terms of his own very able brief. First he attacks the "disease" aspect of

reversing convictions when it has disagreed with the jury's conclusions as to the value of specific expert psychiatric testimony." Reid, Understanding The New Hampshire Doctrine of Criminal Insanity, 69 Yale L.J. 367, 390–91 (1960). (Footnotes omitted.)

"To believe that one's own theories are facts is considered by many contemporary psychiatrists as a 'symptom' of schizophrenia. Yet this is what the language of the Durham decision does.

It reifies some of the shakiest and most controversial aspects of contemporary psychiatry (i. e., those pertaining to what is 'mental disease' and the classification of such alleged diseases) and by legal fiat seeks to transform inadequate theory into 'judicial fact.'" Dr. T. S. Szasz, Psychiatry, Ethics, and the Criminal Law, 58 Colum.L.Rev. 183, 190 (1958).

6. Carter v. United States, 1957, 102 U.S. App.D.C. 227, 235, 252 F.2d 608, 616.

the rule and argues that in Blocker's trial

"the issue of insanity was for all purposes tried and decided solely on the catch-phrase 'mental disease,' with the result that appellant was effectively denied a jury trial on that vital issue."

Second, he attacks the "product" aspect in these terms:

"What happened in appellant's trial was a classic case of usurpation of the jury function by expert witnesses, *and it should be promptly corrected.* Permitting the sort of questioning and testimony that was indulged in below undermines the whole purpose behind the promulgation of the Durham rule, for it tends to narrow the scope of psychiatric testimony on the accused person's mental condition. Furthermore, it is especially dangerous to permit psychiatric testimony in terms that the jury is likely to regard as conclusive on the question of criminal responsibility, *for psychiatrists have no competence whatsoever to offer opinions on that ultimate question."* (Emphasis added.)

(1)

*The Term "Disease" Is Inadequate*

The rule we adopted in 1954 is based on the premise that the critical threshold issue is whether the defendant has a "mental disease or defect." Our opinion did not define these terms except to say that the former is a "condition which is considered capable of either improving or deteriorating" while the latter was fixed and subject neither to improvement nor deterioration. This merely distinguishes "disease" from "defect" without defining either term. Not being judicially defined, these terms mean in any given case whatever the expert witnesses say they mean. We know also that psychiatrists are in disagreement on what is a "mental disease," and even whether there exists such a definable and classifiable

condition. So distinguished an authority as Dr. Philip Q. Roche, author of The Criminal Mind, which received the Isaac Ray Award from the American Psychiatric Association, said as recently as 1958:

"I will say there is neither such a thing as 'insanity' nor such a thing as 'mental disease.' These terms do not identify entities having separate existence in themselves. * * * 'Mental illness,' a medical term, borrowed from the mechanistic concepts of classical physical disease, refers to an altered internal status of the individual vis-a-vis his external world as interpreted by others. In a way the term is a misnomer, since the mental illness [7] is not actually something limited to a place called the 'mind,' but rather it is a changed interrelationship of the individual with his fellow creatures. * * * To the psychiatrist the mental illness can have a meaning *only in the sense of what in the future will be done to or with the patient to relieve him and those around him."* (Emphasis added.) Symposium on Criminal Responsibility and Mental Disease, 19th Annual Law Institute, Univ. of Tenn. 1958, in 26 Tenn.L.Rev. 221, 240–41 (1959).

Dr. Charles Savage, writing in The American Journal of Psychiatry tells us:

"Though widely heralded as bringing legal psychiatry more in line with modern psychology, it [the Durham rule] actually does no such thing. It is a peculiar mixture of Aristotelean faculty psychology, metaphysics, mysticism, and mediaeval theology. * * * It is indeed vague particularly in the matter of the first test of responsibility: that of mental illness. There are very few people who could not qualify under this test * * *." Dr. C. Savage, Discussion, 116 Am. J. of Psychiatry 295, 296 (1959).

7. The Durham opinion treated the terms "mental disease" and "mental illness" as interchangeable.

Dr. John R. Cavanagh has said:

"The term *disease* is also misleading because it leads to the misconception that each psychic disorder must have some specific cause, e. g., as the specific cause of tuberculosis is the tubercle bacillus. This is not true. In reference to this term, Hinsie and Shatsky make this comment: 'It is not considered in keeping with the available facts to refer to a psychosis as a disease * * *.'

"In view of this evidence [various cited authorities omitted], the term *disease* as applied to mental conditions should be dropped because it is misleading." Cavanagh, A Psychiatrist Looks At The Durham Decision, 5 Catholic U.L.Rev. 25, 28, 30 (1955).

The literature on the subject since 1954 abounds with similar comments. This is not to suggest we cannot rely on so uncertain an "infant science" as psychiatry but rather to suggest that no rule of law can possibly be sound or workable which is dependent upon the terms of another discipline whose members are in profound disagreement about what those terms mean. How can lay jurors possibly understand and apply terms whose meaning is unclear to acknowledged experts? This is not simply a matter of experts disagreeing on opinions or on diagnosis, which often occurs, but disagreement at the threshold on what their own critical terms mean.

The fallacy of judicial reliance on terms such as "disease" or "disorder" is further illustrated by a series of cases in this court, including the first trial and appeal of this appellant. We reversed Blocker's first conviction because after his trial and while his appeal was pending in this court, another case, In re Rosenfield, D.C.D.C.1957, 157 F.Supp. 18 [8] was being heard on petition for release on a writ of habeas corpus. In that case a psychiatrist made it known to the District Court that between the court session on Friday and Monday morning, St. Elizabeths Hospital, by some process not then disclosed, altered its "official" view that sociopathic or psychopathic personality disorder was *not* a mental disease. It had been decided that commencing Monday, St. Elizabeths Hospital and its staff would thereafter call and classify the condition known to them as "psychopathic personality" as a "mental disease" or "mental disorder." [9]

The courts, of course, have neither concern nor control over the nomenclature or diagnostic terms of the medical discipline. To the extent that such nomenclature constitutes a form of "shorthand" language to facilitate communication within the profession it is of no concern to anyone outside. But the impact of this "week-end change" was shown when Blocker then came to this court and claimed (1) that he was a sociopathic or psychopathic personality, (2) that he was entitled to a new trial under circumstances where his condition could be described as a "mental disease" under the revised definition. In Blocker's first trial three psychiatrists who testified said he had no "mental disease." I am now satisfied that our reversal of Blocker's first conviction on the stated grounds [10] without more, was an error (and one in which I participated at the time.) In holding as we did, we tacitly conceded the power of St. Elizabeths Hospital Staff to alter drastically the scope of a rule of law by a "week-end" change in nomenclature which was without any scientific basis, so far as we have any record or informa-

8. See also testimony in United States v. Leach, Crim. No. 450–57 D.D.C.; and discussion in Blocker v. United States, 1959, 107 U.S.App.D.C. 63, at pages 65–71, 274 F.2d 572, at pages 574–580 (dissent).

9. This is reminiscent of Lewis Carroll's classic utterance: "When *I* use a word," Humpty Dumpty said, in rather a scornful tone, "it means just what *I* choose it to mean—neither more nor less."

10. Other substantial asserted grounds for reversal of Blocker's first conviction were not reached in our opinion and may well have warranted such action.

tion.[11] If the impact of the "week-end" change was confined to the hospital for clinical and professional purposes of psychiatrists and their aides, we would have no cause to concern ourselves.[12] But this change altered the scope of the "disease-product" test to embrace a vast number of people and problems not contemplated by this court when the rule was adopted. Of course legal rules should be flexible enough to embrace the bona fide, and scientifically recognized developments and discoveries of medicine.[13]

Standards which are to be relied on by judges and juries, by their very function should not be subject to such wide variation from case to case or witness to witness or month to month. Evenhanded justice cannot be measured out with a "rubber" yardstick.

These factors, I think, demonstrate that a term such as "disease" which has no fixed, agreed or accepted definition in the discipline which is called upon to supply expert testimony and which, as we have seen, is literally "subject to change without notice" is a tenuous and indeed dangerously vague term to be a critical part of a rule of law on criminal responsi-

---

11. We can take judicial notice that the American Psychiatric Association altered its nomenclature in 1952 to change psychopathic personality disturbance or sociopathic personality disturbance from a non-disease category into a mental disease. Whether this was by "voice vote" at a convention or some other parliamentary process we are not informed. The medical literature suggests that a large number, perhaps even a majority of psychiatrists do not consider "psychopathic personality disturbance" a mental disease.

In his recent Isaac Ray Award book The Criminal Mind (1958), Dr. Roche tells us:

"Psychiatric nomenclature is undergoing revision and there is considered the possibility of discarding the terms 'psychosis' and 'neurosis' altogether in favor of a more flexible framework in keeping with our present knowledge and operational methods. * * * It would be of interest to the legal profession that the term 'psychopathic personality' is no longer regarded by psychiatry as meaningful, yet it will probably remain embalmed for some time to come in the statutes of several States. * * *" Id. at 25.

On the preceding page of the same work the author has already told the reader that

"Two of the most frequently encountered terms in psychiatry are 'psychosis' and 'psychoneurosis' ('neurosis') and it might appear that in such currency their meaning should be settled in universal agreement. This is not the case. Not only is there confusion, theoretically and practically, as to the precise meaning of each term, but also is there often as much confusion as to the existence of a pathological process to which either or both terms can be applied." Id. at 24–25.

12. As to the substance of the change in classification or nomenclature there is good reason to reject it categorically so far as the courts are concerned. Many psychiatrists do not accept the view that "psychopathy" is or should be classified as a "disease." Responsible experts have testified in cases in this jurisdiction that to cure a psychopath the treatment must change his entire personality—something few psychiatrists think possible. The Isaac Ray Award book, The Criminal Mind states:

"Psychiatry is yet divided in its concept of psychopathy. Some subscribe to the view that the psychopath in our society imposes a greater threat than the conventially insane * * *. Few psychopaths have been changed." Roche, The Criminal Mind 257–58 (1958). (Emphasis added.)

See testimony of Dr. Cushard, Ragsdale v. Overholser, 1960, 108 U.S.App.D.C. 308, 281 F.2d 943, 945 note 5: "I don't think a [psychopath] improves or recovers from his personality. * * * In other words, I think these people are able to control their acts if they make the necessary effort."

13. As recently as 1957 the most that the court claimed for these "diagnostic terms" was that they are "abbreviations for sets of symptoms which are relatively standardized in medical literature and increasingly relied upon in practice." Lyles v. United States, 1957, 103 U.S.App.D.C. 22, 37, 254 F.2d 725, 740, certiorari denied 1958, 356 U.S. 961, 78 S.Ct. 997, 2 L.Ed.2d 1067. (Emphasis added.) Yet it is to such "diagnostic terms" that we had already firmly tied a rule of law.

bility.[14] Later I shall try to demonstrate that the law need not concern itself with whether the accused has a "mental disease" or illness by any particular name or label and hence testimony about "disease" as such is not relevant. Our 1954 opinion purported to free the problem from labels, but we are now more prisoners of labels than before. Lest these observations be taken as a criticism of the medical profession, I emphasize that this court, not the psychiatrists, made the rule.

### (2)

#### The Term "Product" Is Inadequate

Appellant's second attack is on the "product" aspect of the test, particularly the matter of allowing experts to testify in conclusory terms, and terms which are the ultimate issue of criminal responsibility. Our 1954 opinion assumed, without discussion, that mental disease can "produce" or cause criminal acts.

"This is the kind of alchemy that has no counterpart in the data of experience and which is responsible for much loss of communication. The idea that mental illness *causes* one to commit a crime or that it produces a crime has an unmistakable lineage from demonology. * * Can one supply an explanation for the observation that 'mental illness' does not invariably produce crime; in fact, [it is] the exception to the rule?" Roche, Durham and The Problem of Communication, 29 Temp.L.Q. 264, 269 (1956).

In ordinary usage the term "product" has a reasonably well understood meaning in relation to everyday matters. But in Durham the word is not used in relation to ordinary matters or subjects familiar to laymen or indeed even to judges. There it is used rather in a quasi-medical sense of being the causal link between the "disease" and the crim-

inal act charged. So used it is a spurious term, neither wholly medical nor wholly legal but partaking of both. Another leading psychiatrist states:

"Durham takes the notion of 'mental illness' and requires the psychiatrist and the jury to determine whether the criminal act in question was committed as a result of such 'illness.' This, too, [like disease] is supposed to be a 'fact.' Unfortunately, this not only cannot be a fact, but it cannot even be a theory. * * * The very occurrence of the crime—of almost any crime today—functions as a powerful impetus for the creation of a theory to explain it." Szasz, Psychiatry, Ethics, and the Criminal Law, 58 Colum.L.Rev. 183, 190–91 (1958).

Apart from all other objections the product aspect of Durham is a fallacy in this: assuming arguendo that a criminal act can be the "product" of a "mental disease" that fact should not per se excuse the defendant; it should exculpate only if the condition described as a "mental disease" affected him so substantially that he could not appreciate the nature of the illegal act or could not control his conduct.[15]

### (3)

#### Scope of Expert Testimony

Opinion testimony is one of those practical anomalies of the law of evidence devised to help a jury of laymen understand technical subjects on which they would be required to speculate or guess without some expert explanation. Expert opinion is used on the theory that the subject cannot be made clear to lay jurors in any other way. The opinion testimony so admitted presumably bears on the issue which the jury must decide, and hence the opinion may well have substantial persuasive effect on the jury,

---

14. A distinction must be made between permitting experts to describe the diagnosis, as we should, and making a par-

ticular diagnosis, i. e., "mental disease", the threshold fact question for the jury.

15. Compare part III infra.

provided they consider the expert trustworthy.[16]

The contention that to allow such conclusory opinions in the very terms of the jury issue "usurps" the jury power probably goes too far. But so long as our rule is phrased in terms which make expert testimony essential for elaboration, conclusory testimony is not only relevant but probably the most persuasive testimony that can be offered, as appellant bitterly complains.[17]

The hazards in allowing experts to testify in precisely or even substantially the terms of the ultimate issue are apparent. This is a course which, once allowed, risks the danger that lay jurors, baffled by the intricacies of expert discourse and unintelligible technical jargon may be tempted to abdicate independent analysis of the facts on which the opinion rests; this is also likely where the opinion giver is a skilled forensic performer.

Professor Wigmore and others have urged.that these dangers, inherent in expert testimony in terms of the ultimate issue, are minimized by the freedom of the jury to reject the expert's conclusion.[18] But this essential protection was abandoned in this context by our decision in Douglas v. United States, 1956, 99 U.S.App.D.C. 232, 239 F.2d 52. Under the Douglas opinion, the case is left in the hands of the jury only if there is disagreement among the psychiatrists or if the expert testimony supports guilt; if the psychiatrists all agree that the defendant has a "disease" and the act was its "product," then the issue is taken from the jury. Paradoxically we call on laymen to resolve conflicts both in technical terms and substance which the experts cannot resolve among themselves! But Douglas now denies jurors their historic right to pass on the credibility of the experts.

Appellant's contention has much validity if we treat it as addressed to how far we will let experts go in expressing conclusions in the same terms as the jury's question. So viewed the problem is one of the soundness of a rule whose very terms encourage if not require the experts to state conclusions in the terms of the ultimate issue. The solution lies not in throwing out the psychiatrist with the problem, but in adopting a test which renders such conclusions less important. We should, then, firmly prohibit all questions which allow the expert literally "to tell the jury how to decide the case." We emphasize that we would bar these opinions not because they are conclusions, but because they are, in this context and for these purposes, *conclusions of law*, for which the psychiatrist has no competence.[19] Al-

16. See United States v. Spaulding, 1935, 293 U.S. 498, 55 S.Ct. 273, 79 L.Ed. 617; Simmons v. United States, 1953, 92 U.S. App.D.C. 122, 206 F.2d 427.

17. Even while giving fulsome praise to the "disease-product" test one commentator in 1955 accurately, even if unintentionally, predicted how this test would operate:
"It is true that the existence of a mental disease or defect is not the complete test set forth in Durham; the complete test is whether the defendant's crime was the product of a mental disease or defect. Yet, the introduction of any evidence of insanity—any testimony on behalf of the defense that the defendant suffers from mental disease—will apparently cast not only the burden of proving sanity beyond a reasonable doubt, *but also the burden of proving lack of connection between disease and crime*, beyond a reasonable doubt—upon the prosecution. Moreover, the average psychiatrist's attitude toward criminal behavior seems to embody, *as a basic assumption*, that such behavior is prima facie .evidence of mental disease. It can, therefore, be expected that few psychiatrists will hesitate to find the *necessary* causal connection between the crime and the disease, once they have determined the disease to exist, knowing a crime has been committed. * * *" De Grazia, The Distinction of Being Mad, 22 U.Chi.L.Rev. 339, 342–43 (1955). (Emphasis added.)

18. 7 Wigmore, Evidence § 1920 (3d ed. 1940).

19. Professor Roche, among others, plainly prefers that psychiatrists be not required or even *allowed* to testify as to a conclusion that a given act is the

lowing such conclusory opinions is comparable to allowing some "traffic expert" to testify that a litigant drove his car in a "reckless manner," or that he failed to exercise "ordinary care." See Kenney v. Washington Properties, Inc., 1942, 76 U.S.App.D.C. 43, 128 F.2d 612, 146 A.L.R. 1. Excluding such "conclusions" expressed in the same terms as the ultimate jury question seems to me the only safeguard to avoid transferring the jury function to experts, a burden few in the medical profession seek.

A reasonable corollary to a holding that experts may not testify precisely or substantially in the terms of the ultimate jury issue is that the experts should have wide latitude in describing their findings in their own terms, translated, one would hope, so that the judges and jurors can understand. While the law should resist any effort of another discipline to impose its terms upon the law, judges should be hospitable to allowing technical experts to express themselves in terms meaningful to them. This is not simply a matter of prohibiting a psychiatrist from testifying in terms of a legal or jury test. A standard of criminal responsibility which is intelligible to laymen will, of necessity, be in terms other than those of the psychiatrist's discipline.

It is the explanation of the abnormality, not its name, that is important. Some juries will be impressed by a "name" like schizoprenia or manic depressive psychosis, others may not. All juries will be impressed by lucid explanations of the forces, drives and compulsions which affect the controls of an abnormal personality which has become separated from reality. Perhaps the reason why the legal profession and the experts have ignored the admonition of Carter to emphasize medical reasons and explanation rather than conclusions is that they all tend to take the "easy way" and Durham puts a premium on this "easy way."

## II

### Experience Under Disease-Product Test

It is not too surprising that the problem of standards of criminal responsibility has caused so much difficulty. For centuries the most perplexing problem in criminal justice has been the fixing of reliable standards to distinguish the wrongdoer who should be punished from the one who should be treated. This is reflected in part by the fact that in the short span since 1954 this court has written some 70 opinions growing directly out of the "disease-product" test. In large part, however, the inordinate number of appeals and appellate opinions in this jurisdiction stems from the vagueness, lack of clarity, and the psychiatric orientation of that test and in its departure from accepted legal concepts in the jury instruction. While the time span since 1954 is brief, our total study and collective case consideration of the problem is equal perhaps to as much as a half century of case review of this problem in most jurisdictions. Although 90 years have elapsed since New Hampshire first adopted a related "disease-product" test, its appellate experience since then sheds no light on the problem. The antiquity of the test thus proves nothing as to its soundness. No other court has any experience with the "disease-product" test as such.

As we tried to cope with the flood of cases and problems arising out of our

"product" of a "disease." He states in a discussion of the Durham form of instruction:

"The 'product test' is a *subjective* determination upon which is pivoted the question of moral responsibility, i.e. penalty, which the court or jury can and should resolve. It is not too much to ask the triers to make verdicts in their own terms; it is within the power of the courts to do so. *I would submit that* *if the product question is withheld from the expert and confined to the triers, psychiatry can function properly.* The jury can decide the matter under applicable law as instructed by the court, since it is determining a moral (legal) issue *in its own terms.* In this insulation of the psychiatrists from the 'product' question we are keeping our symbols straight and pure." Roche, The Criminal Mind 266 (1958). (Emphasis added.)

1954 decision, it is plain that this court made a sincere and maximum effort to render the new test workable. That it is not workable and ought to be changed is, as suggested, a consequence of its being medically rather than legally oriented and being cast in language which is vague and confusing in some respects and restrictive in others.[20] Having adopted a standard of criminal responsibility with "built in" ambiguities, we virtually invited "reasonable doubt" in every case where the issue was presented. The correct direction of Durham was to broaden the scope of medical inquiry but the incorrect step was to try to do this in terms which ignore the elements of recognition of wrongdoing and capacity to control conduct. As has been shown, the majority of psychiatric writers do not want the jury inquiry limited to the terms of the medical inquiry.

## III

### An Alternative Approach

#### (1)

##### Basic Assumptions of the Criminal Law

While philosophers, theologians, scientists and lawyers have debated for centuries whether such a thing as "free will" really exists, society and the law have no choice in the matter. We must proceed, until a firm alternative is available, on the scientifically unprovable assumption that human beings make choices in the regulation of their conduct and that they are influenced by society's standards as well as by personal standards. We can, in the abstract, agree with Aquinas that man "the framer of human law, is competent to judge only the outward acts; * * * God alone the framer of the divine law, is competent to judge the inward movement of wills." But an ordered society must make preliminary judgment on its members to protect and preserve society even while leaving perfect justice to higher authority. Our Durham utterances which seemed to align this court on the side of "free will" alarmed some scientific minds[21] but their fears were groundless. When it came to explaining to the jurors the standards *they* were to use, we see that all reference to man's capacity to make choices in regulating conduct or any connection between the power to make choices and criminal responsibility was carefully eliminated.

Mr. Justice Cardozo said that all law in Western civilization is

> "guided by a robust common sense which assumes the freedom of the will as a working hypothesis in the solution of [legal] problems." Steward Machine Co. v. Davis, 1937, 301 U.S. 548, 590, 57 S.Ct. 883, 892, 81 L.Ed. 1279

20. In Tatum v. United States, 1957, 101 U.S.App.D.C. 373, 249 F.2d 129, we altered the burden of proof rule laid down in Davis v. United States, 1895, 160 U.S. 469, 16 S.Ct. 353, 40 L.Ed. 499. The Davis burden, heavy as it was, did not shift to the prosecution the burden of proving absence of "insanity" until some evidence appeared. In Tatum and later in Clark v. United States, 1958, 104 U.S. App.D.C. 27, 259 F.2d 184, we laid down the rule that a self serving statement by the accused that he thinks he is "insane" or "crazy" shifts the burden of proof and requires the prosecution to prove beyond a reasonable doubt that there is no "disease" or if any that the crime is not its "product." When experts cannot agree about these terms the prosecution's burden is, as a practical matter, an enormous one simply because conflict and confusion tend to suggest doubt. Douglas, as noted, aggravates this problem by treating medical testimony as conclusive if it is not disputed by other medical testimony. The time is not too distant when the Supreme Court must re-examine the Davis burden of proof in light of the fact that most psychiatrists see doubt about mental capacity in every person who commits a serious criminal act. This is not suggested as a criticism of psychiatry but of the unrealistic standard of law in relation to current medical attitudes. See note 17 supra.

21. See Symposium on Insanity and The Criminal Law, 22 U.Chi.L Rev. 317 (1955).

and **Mr. Justice Jackson** in a similar vein said:

"Whatever doubts [theologians, philosophers and scientists] have entertained as to the matter, [of free will] the practical business of government and administration of the law is obliged to proceed on more or less rough and ready judgments based on the assumption that mature and rational persons are in control of their own conduct." Gregg Cartage & Storage Co. v. United States, 1942, 316 U.S. 74, 79–80, 62 S.Ct. 932, 935, 86 L.Ed. 1283.

Judge Arnold in Fisher v. United States, 1945, 80 U.S.App.D.C. 96, 97, 149 F.2d 28, 29, echoed Cardozo and Jackson:

"In the determination of guilt age old conceptions of individual moral responsibility cannot be abandoned without creating a laxity of enforcement that undermines the whole administration of criminal law."

When we say that the standard of criminal responsibility is a legal rather than a medical or scientific problem, we are saying that in a larger sense it is a social question in that it is established to regulate the social order. As such we may appropriately use scientific aids in the application of the standard, but the standard itself is the law's expression of the collective morality.

The New Hampshire "disease-product" test of 1869 was, as we now know, strongly influenced by Dr. Isaac Ray, often described as the "father of American psychiatry." For 85 years every court which considered the New Hampshire test rejected it. Every court which considered Durham has rejected it.[22] It is sometimes argued that this alone shows the concept was unsound and not in keeping with American legal ideas. I do not think that follows. The "disease-product" test was rejected not because the underlying concept was unsound but because the "rule" or standard was stated in terms unfamiliar and without real meaning to the lay jurors who had to apply it to the facts and to the judges who had to frame the instructions. Judges and lawyers for centuries have approached problems of responsibility for criminal acts, for contracts, for wills as well as certain intentional torts in terms

22. Dusky v. United States, 8 Cir., 1959, 271 F.2d 385, 401, reversed on other grounds, 1960, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824; Black v. United States, 9 Cir., 1959, 269 F.2d 38, certiorari denied 1960, 361 U.S. 938, 80 S.Ct. 379, 4 L.Ed.2d 357; Voss v. United States, 8 Cir., 1958, 259 F.2d 699; Sauer v. United States, 9 Cir., 241 F.2d 640, certiorari denied 1957, 354 U.S. 940, 77 S.Ct. 1405, 1 L.Ed.2d 1539; Andersen v. United States, 9 Cir., 1956, 237 F.2d 118; Howard v. United States, 5 Cir., 1956, 232 F.2d 274; United States v. Kunak, 1954, 5 U.S.C.M.A. 346, 17 C.M.R. 346; United States v. Smith, 1954, 5 U.S.C.M.A. 314, 17 C.M.R. 314; State v. Crose, 1960, 88 Ariz. 389, 357 P.2d 136; Downs v. State, Ark.1959, 330 S.W.2d 281; People v. Nash, 1959, 52 Cal.2d 36, 338 P.2d 416; Early v. People, Colo.1960, 352 P.2d 112 (M'Naghten test incorporated in statute); State v. Taborsky, 1960, 147 Conn. 194, 158 A.2d 239; State v. Davies, 146 Conn. 137, 148 A.2d 251, certiorari denied 1959, 360 U.S. 921, 79 S.Ct. 1441, 3 L.Ed.2d 1537; Piccott v. State, Fla. 1959, 116 So.2d 626; People v. Carpenter, 1957, 11 Ill.2d 60, 142 N.E.2d 11; Flowers v. State, 1957, 236 Ind. 151, 139 N.E.2d 185; State v. Andrews, 1960, 187 Kan. 458, 357 P.2d 739; Bryant v. State, 1955, 207 Md. 565, 115 A.2d 502; Thomas v. State, 1955, 206 Md. 575, 112 A.2d 913; Commonwealth v. Chester, 1958, 337 Mass. 702, 150 N.E.2d 914; State v. Finn, 1960, 257 Minn. 138, 100 N.W.2d 508 (test incorporated in statute); State v. Goza, Mo.1958, 317 S.W.2d 609; State v. Kitchens, 1955, 129 Mont. 331, 286 P. 2d 1079 (dictum); Sollars v. State, 1957, 73 Nev. 248, 316 P.2d 917 (dictum); State v. Lucas, 1959, 30 N.J. 37, 152 A.2d 50, 64–69; People v. Johnson, Westchester County Ct.1957, 13 Misc.2d 376, 169 N.Y.S.2d 217 (test incorporated in statute); State v. Robinson, Ohio App.1958, 168 N.E.2d 328 (deferring to the state supreme court); Commonwealth v. Woodhouse, 1960, 401 Pa. 242, 164 A.2d 98; State v. Kirkham, 1958, 7 Utah 2d 108, 319 P.2d 859; State v. Goyet, 1957, 120 Vt. 12, 133 A.2d 623, 650–654; State v. Collins, 1957, 50 Wash.2d 740, 314 P.2d 660. But see V.I. Code tit. 14, § 14 (1957).

of capacity to exercise will which in modern parlance is capacity to control conduct or regulate behavior to conform to certain standards. Testamentary disposition of property embodied this basic concept into the very name of the implementing document by calling it the testator's "will." A "will" is recognized by society and attended by fixed legal consequences only if it is truly a manifestation of the exercise of the maker's will and choice.

There was no reason to depart from these basic principles in 1954. To resort to the "product of disease" test rather than continue to develop the familiar concept of capacity to make choices pointlessly breaks continuity with the experience of past centuries. Moreover, it unnecessarily complicated and delayed the logical development of the law on this subject by many decades.

Justice Ladd, even while adopting the original 1869 "disease-product" test in New Hampshire, qualified it in correct terms in a very sound discussion which has been largely overlooked. He said:

> "If the defendant had an insane impulse to kill his wife, which he could not control, then mental disease produced the act. *If he could have controlled it, then his will must have assented to the act, and it was not caused by the disease, but by the concurrence of his will, and was therefore crime.*" State v. Jones, 1871, 50 N.H. 369, 399. (Emphasis added.)

This is what we ought to tell the jury, for here we have a clear recognition that *capacity for choice and control* was not abandoned as a rationale of the New Hampshire rule. That court, however, seems to have taken the same step we did in treating this most important element of criminal responsibility as something to be kept secret from the jury.[23]

No test for criminal responsibility can be adequate if it does not place squarely before the jury the elements of cognition and capacity to control behavior. It is not enough for judges to say this is the *basis* or the "basic postulate"; it literally must be the "yardstick" the jury is *instructed* to apply. Our failure to put the issue to the jury in these "basic" terms has led critics of our test to charge us with paying merely "lip service" to the "legal and moral traditions of the western world." Until we put this "basic postulate" *into the jury instructions* the criticism is valid; if we really accept what we say is the "basic postulate" we cannot rationally justify withholding that idea from the jury. Indeed until we put it into the jury instruction we are denying it.

It is the combination of our "disease-product" test and the rigors of the Douglas holding and both of these super-imposed on the Davis burden of proof, which, as I see it, has operated to reject the historic basis of criminal responsibility and to substitute something resembling the "determinist" thesis that man's conduct is simply a manifestation of irresistible psychological forces in which ethical and moral values and standards play small part, if any part.[24] Harvard's Professor Berman seems plainly to be addressing himself to the determinists, and indeed answering them when he states:

> "The lawyers in all countries will answer 'if there is no reason, no

---

23. If we simply add the italicized portion of Justice Ladd's statement to our present charge we would vastly improve it. See page 871, infra. See also State v. Jones, 50 N.H. 369, 373, 9 Am.Rep. 242 (1871).

24. Judge Bazelon, author of the Durham opinion, in a discussion of the rule adopted by this court in 1954 has said:
"Evil, of course, can only be punished or forgiven. But illness is supposed to be ameliorated or cured. Thus the name we put to our failures makes a difference. We all tend to believe in free will when we entertain hopes for the future, but switch to determinism when recalling our past failures. *I suggest we extend the same consideration to the failures of others.*" Bazelon, The Awesome Decision. Saturday Evening Post, Jan. 23, 1960, pp. 32, 56.

choice, no will, then there can be no law; we will not sacrifice the legal order to the vagaries of your science.'" Berman, Law as an Instrument of Mental Health in the United States and Soviet Russia, 109 U.Pa. L.Rev. 361, 366 (1961).

The inquiry of the law, whether as to a will, a contract, or a crime should be concerned with and directed to determining whether the act and its consequences were understood and appreciated by the one who performed it and whether it was a manifestation of will or choice. The fact that psychiatrists think of this in terms of behavior controls while lawyers may think of it in terms of will and choice is not particularly important. A jury which hears a psychiatrist testify that an accused suffered from some medically recognized abnormality which destroyed his capacity to control and regulate behavior generally can translate testimony about behavior controls and draw the inference that the accused lacked capacity to exercise his will and make and control a choice between doing or not doing the act charged.

Judge Thurman Arnold was plainly correct in the Holloway [25] opinion in saying that "reconciliation between the medical tests of insanity and the moral tests of criminal responsibility is impossible * * * [because their] purposes are different * * *." Fixing standards of criminal responsibility is a legal not a medical problem and if we adopt a test based, as it should be, on legal con-cepts which grow from our traditional ethical and moral standards, we need not be concerned about reconciling the two. The expert witness describes the mental capacity of the accused in his terms and by his scientific standards and the jury applies to the evidence society's legal standard in terms of capacity to exercise will and choice and decides whether the accused is to be punished or treated.[26]

The proposals we now make would, presumably, satisfy psychiatrists who believe that experts should give medical testimony and jurors apply legal standards to that testimony.

It cannot be emphasized too much that it is neither necessary nor desirable for the psychiatrist to testify in terms of "free will" or "free choice" or "moral blame" or "right and wrong." Appellant's brief correctly points out that the psychiatrist has no special competence in this area and indeed the psychiatrist does not want this burden. His competence, and even that does not rest on certainties, is in medical appraisals of capacity for controls of conduct. The standards we propose for consideration are not at all intended to reduce the scope of the psychiatrist's contribution but, if anything, to enlarge it as to describing all the dimensions of the defendant's capacity, his competence and ability to control and regulate conduct and behavior.

Except for "conclusory opinions" in the same terms as the jury charge, these proposals would allow at least as wide a

---

25. Holloway v. United States, 1945, 80 U.S.App.D.C. 3, 5, 148 F.2d 665, 667.

26. Dr. Roche perceives the heart of the problem when he states that the questions put to the expert *should not* be the same as those put to the jury.

"As matters now stand in such cases the test [question] is first directed to the psychiatrist and then secondly delivered to the jury to accept or reject * * *. Psychiatrists would not presume to abandon any testing device *as long as it remains a legal communication restricted to those who make moral judgments*. The psychiatrist employs tests of his own in the area of medi-cal inquiry. *Psychiatrists would not complain of the M'Naghten formula if it were put exclusively to the jury*, with the medical facts in evidence * *." Roche, The Criminal Mind 172–73 (1958). (Emphasis added.)

The most recent English case in point, an opinion of the Privy Council, indicates that the English courts are solving the problem by broadening the scope of permissible psychiatric evidence, even while retaining the M'Naghten test in the jury instruction. Attorney-General v. Brown, [1960] A.C. 432 (P.C.) (Aust.).

scope to expert testimony as the New Hampshire test or the Durham test. This is consistent, as I have noted, with the basic lines of development of the law of criminal responsibility for centuries and maintains continuity with the past. Those who can control conduct are to be held responsible; those who cannot are relieved but isolated from society so long as their freedom is the source of danger to themselves or to society.

If this court meant in Durham [94 U.S.App.D.C. 228, 214 F.2d 876] that the "legal and moral traditions of the western world require that those who, of their own free will and with evil intent * * commit acts which violate the law, shall be criminally responsible for those acts" then the jury should so be instructed for the jury under our system is society sitting in judgment on one of its members. This alternative would involve no more than to reverse the order of things, using the "disease-product" [27] concept as one means of explaining our own judicial view of what is meant by the "free will" utterance of Durham and Carter, submitting the issue to the jury with instructions cast in terms of whether they believe the defendant was aware his act was a violation of law and if so whether he could have refrained from doing it. This and other alternatives will now be discussed.

(2)

### Alternative Proposals

As we look back, it is now clear that we recognized the shortcomings of our "disease-product" test when we tried to explain it in Carter v. United States, supra, in the very terms the law had used for many years prior to 1954, namely *the capacity to exercise free will and choice.* But it is not enough to recast and restate or explain the 1954 rule in these familiar terms *for lawyers and judges.* It is far more important—indeed imperative—to make the explanation in these terms *to the jury* which must apply the test and decide the issue.[28] That can be accomplished only by changing the instruction from "disease-product" terms to traditional and familiar terms in keeping with the underlying philosophy of our criminal law.

Since at present the views expressed in this opinion are those of less than a majority of the court, we are not called upon to propose with finality a single substitute for the "disease-product" test. The solution should be approached by careful consideration of various proposals which have been under study or actually used, subject, of course, to being framed in compliance with the Davis burden of proof.

Using the Alabama rule [29] as a basis,

---

27. Curiously no real effort was made in the Durham opinion to discuss or develop a rationale for the "disease-product" test. The nearest approach to this is the terse, unsupported conclusion of the court that "our traditions also require that where such [criminal] acts stem from and are the product of a mental disease * * * moral blame shall not attach * * *." But the judicial "why" of this conclusion was never disclosed.

28. "And as medical witnesses time after time express directly opposite opinions in the witness-box concerning the sanity of prisoners on trial, it is not surprising that the legal profession hold that the test of insanity must be such that a jury can appreciate and apply it themselves." East quoted in Michael & Wechsler, Criminal Law and Its Administration 836–37 (1940).

29. In 1887 the whole subject was considered in a scholarly opinion by Mr. Justice Somerville and he approved a combination of tests which included the following:

"In conclusion of this branch of the subject, that we may not be misunderstood, we think it follows very clearly from what we have said that the inquiries to be submitted to the jury, then, in every criminal trial where the defense of insanity is interposed, are these: *First.* Was the defendant at the time of the commission of the alleged crime, as matter of fact, afflicted with a *disease of the mind,* so as to be either idiotic, or otherwise insane? *Second.* If such be the case, did he know right from wrong, as applied to the particular act in question? If he did not have such

**870**

one alternative can be developed in terms of these questions for the jury;

(a) Was the defendant suffering from some medically recognized mental illness, disorder or defect when he committed the act?

(b) If so, did he understand the nature and consequences of the illegal act?

(c) Did his mental condition deprive him of the power to choose between doing the criminal act and avoiding it?

A second alternative is provided by the proposed Model Penal Code of the American Law Institute, which has long and carefully considered the problem of criminal responsibility. The latest proposal, in which Judge John J. Parker had a large part, would provide that

"A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law." Model Penal Code § 4.01 (Tent. Draft No. 4, 1955).

A third proposal is that of the Committee on Criminal Responsibility of the Bar Association of the District of Columbia:

"The jury shall be * * * instructed that the defendant is not mentally responsible if at the time of the alleged offense the defendant, because of an impaired or defective mental condition, was substantially lacking either in his capacity to appreciate that his conduct was wrong

or in violation of law, or in his capacity to conform his conduct to the right or to the requirements of law." Report, 26 D.C.B.Ass'n J. 301 (1959).[30]

Some of these approaches suffer from the demonstrated defect of "labels" which have shifting, restrictive meaning and they fail to come to grips directly with the heart of the problem of criminal responsibility, namely: was the defendant possessed of the indispensable criminal intent, of "a vicious will which motivates a criminal act." Carter v. United States, 1957, 102 U.S.App.D.C. 227, 235, 252 F. 2d 608, 616. For this reason the opinion in Carter affords perhaps the best basis for the formulation of a substitute or amended jury instruction. There we said:

"The basic import of the criminal law is punishment for a vicious will which motivates a criminal act. To understand the defense of insanity one must keep constantly and clearly in mind the basic postulate of our criminal law—in the words of Dean Pound, quoted by Justice Jackson in Morissette, 'a free agent confronted with a choice between doing right and doing wrong *and choosing freely to do wrong.*' If a man is '*amens (id est) sine mente*' in respect to an act to such an extent that in doing the act he is not a free agent, or not making a choice, or unknowing of the difference between right and wrong, or not choosing freely, or not acting freely, he is outside the postulate of the law of punishment. An insane man is not held responsible, because he has not a criminal mind

knowledge, he is not legally responsible. *Third.* If he did have such knowledge, he may nevertheless not be legally responsible if the two following conditions concur: (1) If, by reason of the duress of such mental disease, he had so far lost the *power to choose* between the right and wrong, and to avoid doing the act in question, as that his free agency was at the time destroyed; (2) and if, at the same time, the alleged crime was so connected with such mental disease, in the

relation of cause and effect, as to have been the product of it *solely.*" Parsons v. State, 1887, 81 Ala. 577, 2 So. 854, 866–867.
This opinion remains to this date perhaps the most comprehensive American judicial opinion ever written on the subject of criminal responsibility.

30. The Association did not accept the committee's recommendation, which was offered as a proposed statute.

in respect to the act he committed. That philosophy has never changed, and it is not proposed to change it now. The problem over the years— and the problem now—is not one of philosophy. It is one of translating the accepted philosophy into practical rules of action for everyday use in the courtroom." 102 U.S.App.D. C. at page 235, 252 F.2d at page 616 (Footnotes omitted, emphasis added.)

Applying this concept to guide a jury "for everyday use in the courtroom" it can be put in terms such as the following:

The defendant is not to be found guilty as charged unless it is established beyond a reasonable doubt that when he committed the act, *first*, that he understood and appreciated that the act was a violation of law, and *second*, that he had the capacity to exercise his will and to choose not to do it. If, because of some abnormal mental condition,[31] either of these elements is lacking, he cannot be found guilty. To hold him guilty the jury must find, beyond a reasonable doubt, both that he understood and appreciated the act charged was a violation of law and that he possessed the capacity or competence to choose to do it or refrain from doing it.[32]

One of the fallacies of the formulation of the "disease-product" test of Durham v. United States, apart from its being stated in terms unfamiliar to jurors,[33] was the tacit assumption that the test and the instruction to the jury could be stated "simply." It cannot be stated simply because it is the most complicated, elusive and difficult problem in the criminal law.

Attention may well be called to the fact that a unanimous division of this court said in Carter that the trial judge "ought to explain—not just state by rote but explain—the applicable rules of law." 102 U.S.App.D.C. at page 237, 252 F.2d at page 618. The utterances of this court supply the logical basis for that explanation. It might be helpful if some District Judge would act on our suggestion by venturing to "explain" our standard of criminal responsibility in the same general terms we used to explain it in Carter. See id., 102 U.S.App.D.C. at pages 235–237, 252 F.2d at pages 616–618. To the extent that this opinion is consistent with those utterances it may also afford some aid. The critical factor is that the jury be informed fully on the "basic postulate" of the law of criminal responsibility as this court has described it in Carter and in the closing paragraph of Durham.

We would err gravely if we were to suggest that these proposed tests or standards possess the virtue of certainty. They do not. No test fashioned by man and relying on words can achieve absolute certainty. All we can do is to try, on the

31. Under this form of test or rule there is no particular need to exclude a medical diagnosis if a proper foundation is laid. However, the need to produce such evidence is lessened since the question is whether a medically recognized abnormal mental condition has eliminated the defendant's capacity to understand and to control his acts, rather than whether he has a specific "disease."

32. It would, of course, be absurd to instruct a jury that they must find the elements of *cognition* and *volition* in order to hold the accused responsible. Yet these are terms in which psychiatrists and other sophisticated persons often describe this standard.

33. In various opinions we have quoted from the Report of the Royal Commission on Capital Punishment. The following, which we have never quoted, is one of the alternative tests proposed by the Commission in essentially the same terms as the above proposals:

"The jury must be satisfied that, at the time of committing the act, the accused, as a result of disease of the mind (or mental deficiency)

"(a) did not know the nature and quality of the act or

"(b) did not know that it was wrong or

"(c) was incapable of preventing himself from committing it." Royal Commission on Capital Punishment, Report, Cmd. No. 8932 at 111 (1953).

basis of experience rather than logic, to reduce the uncertainty when we recognize it. That in itself would be progress. Some one or a combination of these proposals must sooner or later supplant the Durham rule.

I am authorized to state that Chief Judge MILLER, and Circuit Judge BASTIAN join in the views expressed in this opinion as to the need for a change in the standard of criminal responsibility.

FAHY, Circuit Judge (concurring).

I concur in the opinion of the court.

Without going into other areas of disagreement with my Brother BURGER'S opinion, I feel obligated to refer to his statements that the opinion of this court in Douglas v. United States, 1956, 99 U.S. App.D.C. 232, 239 F.2d 52, leaves a case "in the hands of the jury only if there is disagreement among the psychiatrists or if the expert testimony supports guilt," that Douglas "denies jurors their historic right to pass on the credibility of the experts," and in note 20 that Douglas treats medical testimony as conclusive if it is not disputed by other medical testimony.

Aside from the fact that the credibility of the experts was not involved in Douglas at all, it is I think a mistake to say that Douglas holds that a case is to go to the jury only in event of disagreement among the psychiatrists or only if the expert testimony supports guilt, or to say that it treats medical testimony as conclusive if not disputed by other medical testimony. The fact is that the Douglas opinion, in concluding the evidence as a whole did not warrant submission of the case to the jury, considered the nonexpert testimony along with the expert. Moreover, one of the reasons assigned in the opinion for remanding the case for a new trial, rather than directing an acquittal by reason of insanity, was to afford the government an opportunity to overcome "the dearth of the prosecution's non-medical testimony, dating on the present records only from the time of the robberies." 99 U.S.App.D.C. at page 240, 239 F.2d at page 60.

Still confining myself to Douglas, since I do not wish to use the present case for an extended discussion of the problem of criminal responsibility, the following analysis in the Douglas opinion of the post-Durham legal situation may be found by some to be reassuring:

"As to the criteria, or tests, to be used in resolving this issue [of criminal responsibility] Durham gives greater latitude than theretofore had prevailed in this jurisdiction. We had said in Holloway, following the M'Naghten rule, 8 Eng.Rep. 718, that 'The ordinary test of criminal responsibility is whether defendant could tell right from wrong', but we had there added, 'A slightly broader test is whether his reason had ceased to have dominion of his mind to such an extent that his will was controlled, not by rational thought, but by mental disease.' 80 U.S.App.D.C. at page 4, 148 F.2d at page 666. In the earlier case of Smith v. United States, 59 App.D.C. 144, 36 F.2d 548, 70 A.L.R. 654, we had also added the 'irresistible impulse' test which permitted the jury to consider whether the accused suffered from such a 'diseased mental condition as to deprive him of the will power to resist the insane impulse * * *.' Id., 59 App.D.C. at page 145, 36 F.2d at page 549. But in Durham we concluded that the advance of psychiatric knowledge demonstrated the fallacy of making these particular '"symptoms, phases or manifestations"' [9] the exclusive criteria to guide the jury. In so holding, however, we did not purport to bar all use of the older tests: testimony given in their terms may still be received if the expert witness feels able to give it, and where a proper evidential foundation is laid a trial court should permit the jury to consider such criteria in resolving the ultimate issue 'whether the accused acted because of a mental disorder'. In aid of such a determination the court may permit the jury to con-

sider [10] whether or not the accused understood the nature of what he was doing and whether or not his actions were due to a failure, because of mental disease or defect, properly to control his conduct.

"9 [Footnote 9 omitted.]

"10 The charge to the jury outlined by this court in Durham, supra, 94 U.S.App.D.C. at page 241, 214 F.2d at page 875, was not intended to be a model for all cases. We explicitly stated: 'We do not, and indeed could not, formulate an instruction which would be either appropriate or binding in all cases.' It is essential to a charge under the Durham decision that there be a proper statement of the ultimate issue in an insanity defense. But the evidence submitted in each case may differ and consequently the particular tests available to aid in deciding the ultimate issue would not always be the same."

WILBUR K. MILLER, Chief Judge, with whom BASTIAN, Circuit Judge, joins (dissenting).

For the second time, by an order entered without an explanatory opinion, this court has saved Comer Blocker from paying the penalty for his crime which two juries have found was not the product of a diseased or defective mind but was murder in the first degree. In the foregoing opinion, issued after the order, the majority base reversal on an alleged error in the charge to the jury as to the burden of proof on the insanity issue. As in the opinion on the first appeal, the majority are content merely to say there was a conviction of first degree murder. Not a word is said as to the crime itself. Such a laconic statement is hardly adequate as a picture of the factual situation which was presented to the jury. This device, whether or not so intended, tends to focus pity on the appellant and to divert attention from the fact that he committed a brutal murder. I think the reader is entitled to a summary of the evidence upon which the jury reached its drastic verdict, so he may know what Blocker did to the decedent as well as what the trial judge did to him. For that reason, I set forth what now becomes a twice-told tale.

On April 5, 1957, Comer Blocker was and had been for some time separated from his common law wife, Frances Hall, by whom he had five children. He was living in Philadelphia and she was residing with several of her children in a small apartment in the District of Columbia. Evidence for the Government showed that in Philadelphia Blocker had bought a shotgun and a carrying case for it; and that on April 5, he brought the gun with him to the District of Columbia and hid it in a wooded area. About 11:00 o'clock that night, having repossessed the gun, he knocked on the door of his wife's apartment. The knock was answered by his son Chester, then 14 years old, who attempted to prevent his father from entering when he saw him with a gun. Blocker threatened the boy and backed him into the bedroom where his mother was. As Frances attempted to close and lock the door, a shotgun blast came through it and struck her body.[1] Blocker then entered the room and shot his wife a second time, inflicting wounds on her face and chest.[2] Almost immediately afterward, when he was apprehended, Blocker told an officer that he had come from Philadelphia to kill his girl friend and that he had done so. It does not appear that he was intoxicated that night.

On October 22, 1957, a jury in the United States District Court found Comer Blocker guilty of murder in the first degree and sentence was pronounced in accordance with the statute. Then followed the first appeal to this court, which was orally argued April 6, 1959. Immediately following that argument, without

1. An autopsy revealed the presence of wood splinters in one of her wounds together with the pellets from the shotgun shell.

2. These wounds did not contain splinters of wood.

stopping to write an opinion and over my protest, the court entered an order reversing the conviction and remanding the case for a new trial. It was not until June 25, 1959, that the majority filed an opinion, from which I dissented, showing that the court's precipitate action of April 6 was based solely on a sudden change in nomenclature employed by two doctors who were strangers to the record, as I shall show. Two of the three psychiatrists who testified said Blocker had a "sociopathic personality disturbance" at the time of the murder.[3] The third found nothing wrong with him. But all three doctors agreed that a sociopathic personality disturbance is not a mental disease or defect. By its verdict of guilty, the jury rejected Blocker's plea of insanity and found he had no mental disease or defect when he committed the murder.

But, a short time after Blocker's trial, the Superintendent of St. Elizabeths Hospital and another doctor on the staff (neither of whom had testified) decided that thereafter sociopathic personality disturbance should be classified as a mental disease. It had not been so regarded by them at the time of Blocker's trial, and it did not appear that any one of the three psychiatrists who had testified had changed his opinion as to classification of the "personality disturbance." Solely because of this change of opinion by doctors who had not been witnesses, Blocker's conviction was reversed, as will be seen from the following decisional paragraph from the majority opinion, which is so remarkable that I feel justified in reproducing it:[4]

"On November 18, 1957, less than a month after this verdict was returned, the Assistant Superintendent of St. Elizabeths Hospital testified in another case * that he and the Superintendent of the Hospital were then agreed that people suffering from sociopathic personality disturbance should be 'labelled' as diseased, as mentally ill, mentally sick, suffering from mental disease. Counsel for Blocker promptly moved for a new trial on the basis of this new medical evidence. The motion was denied. We think it should have been granted. Blocker, his life at stake, was entitled to a verdict based upon the most mature expert opinion available on an issue vital to his defense."

In dissenting, I pointed out that at the time of Blocker's trial there were psychiatrists available who would have testified that sociopathic personality disturbance is a mental disease, but none was called by him; that the changed opinion of two St. Elizabeths doctors was not newly discovered evidence, and certainly was not "new medical evidence;" that therefore the motion for a new trial, not being based on newly discovered evidence, was clearly out of time and was properly denied for that reason if for no other; that in addition the trial court correctly denied the motion on the merits.

So, Blocker was tried a second time. Interestingly enough, at the second trial no question arose as to sociopathic personality disturbance, the issue which had caused the majority so much concern on the first appeal. A psychiatrist who had examined Blocker for the first time in the spring of 1960, testified with remarkable hindsight, that he was psychotic on April 5, 1957, the night of the murder. Another psychiatrist, who had testified at the first trial and who had examined Blocker not long after the murder, said he had no mental disease or defect when he committed the crime. Once more the jury rejected the plea of insanity, found that Blocker had no mental disease or defect when he did the killing, and found him guilty of murder in the first degree. And again, as I have said, a majority of

---

**3.** This sounds formidable, but really is not. A sociopath is, to state it simply, a person who cannot get along with other people.

**4.** Blocker v. United States, 1959, 107 U.S. App.D.C. 63, 64, 274 F.2d 572, 573.

*  "See testimony in United States v. Leach, Crim. No. 450–57, D.D.C., and in Rosenfield v. Overholser, D.C., 157 F.Supp. 18."

this court, acting rather precipitately and without opinion, entered an order of reversal on December 12, 1960, and in a later opinion assigned one single reason for that action which I think is not well grounded.

At his second trial, which was conducted from March 28, 1960, through April 2, Blocker's testimony, which was in considerable detail, substantially supported the Government's evidence on both trials, which I summarized earlier in this dissent. He contradicted it in one particular: he said he fired only once, and that accidentally.[5] This was his sole defense. Court-appointed counsel advanced the theory of insanity and introduced "some" evidence of its existence, albeit over Blocker's protest. He did not think he was insane when he did the murder, and it may well be doubted whether his counsel really thought he was then suffering from a mental disease; for the record shows they attempted to persuade him to plead guilty to second degree murder, which he refused to do. Had counsel actually been of the opinion that a diseased mind produced the crime, they probably would have been unwilling to recommend a plea of guilty to a lesser offense, because in a subsequent § 2255 [a] proceeding Blocker probably could obtain a new trial on the ground that failure to plead insanity was ineffective assistance of counsel.

Before discussing the alleged error in the charge, which is the sole reason for reversal, I think it well to point out by way of reminder what the law is in the District of Columbia on the subject of first degree murder. Section 2401, Title 22, D.C.Code (1951), provides, "Whoever, being of sound memory and discretion, kills another purposely * * * of deliberate and premeditated malice * * is guilty of murder in the first degree." And § 2404 of Title 22 provides that "The punishment of murder in the first degree shall be death by electrocution."

The foregoing excerpts from the D.C. Code are Congressional enactments,—in the truest sense the "law of the land," whether we like them or not. The facts in this case are so shocking and so conclusive that two juries have found these drastic provisions applicable.

With this in mind, I turn to the alleged error in the charge of the trial judge. As we said in Kinard v. United States, 1938, 69 App.D.C. 322, 323, 101 F.2d 246, 247, "It is axiomatic that the charge to the jury must be considered as a whole." This has been said many times by us and other courts, and is so thoroughly established that citation of supporting authority is unnecessary. It is a salutary principle, for hypercritical scrutiny of every statement in a charge, when considered alone, would practically always reveal dual meanings.[6] Each portion of a charge should be given a common sense interpretation in relationship with all other portions and the issues raised. The Eighth Circuit said as much in Stoneking v. United States, 1956, 232 F.2d 385, where the following appears at page 389:

> "In considering the effect of a challenged portion of a court's instruction to the jury, this court must view the charge in its entirety to determine whether or not the jury could have been misled by the portions to which objection has been made. Myers v. United States, 8 Cir., 1927, 18 F.2d 529, 530. So here, if we view only the particular portions of the charge objected to, fault might be found; but when viewed in the light of the court's remarks which immediately followed the objected-to portions, we find no reason for criticism, and must conclude that the jury was not confused by the instruction and that taken as a whole it was not improper."

In Boyd v. United States, 1926, 271 U. S. 104, at page 107, 46 S.Ct. 442, at page 443, 70 L.Ed. 857, after reciting a por-

---

5. The evidence that he fired two shots was overwhelming.

a. 28 U.S.C.A. § 2255.

6. Cf. dissent of Mr. Justice Black in Bihn v. United States, 1946, 328 U.S. 633, 639, 66 S.Ct. 1172, 90 L.Ed. 1485.

tion of the charge which was undoubtedly correct, the Supreme Court said:

"Further on in the charge the court indicated that it was not admissible for the defendant to issue prescriptions to a known addict 'for amounts of morphine for a great number of doses, more than was sufficient for the necessity of any one particular administration of it.' Complaint is now made of this. It appears ambiguous, and, if not taken with the rest of the charge might be regarded as meaning that it never is admissible for a physician, in treating an addict, to give him a prescription for a greater quantity than is reasonably appropriate for a single dose or administration. So understood, the statement would be plainly in conflict with what this court said in the Linder Case [Linder v. United States, 268 U.S. 5, 45 S.Ct. 446, 69 L.Ed. 819]. But we think it could not well have been so understood in this instance. *It did not stand alone, but was to be taken in connection with what preceded it, and also with what followed. * *"* (My emphasis.)

The thoroughly established principle that the charge must be considered as a whole, and that a criticized passage must be considered in connection with the language which precedes and follows it, has been totally disregarded by the majority in this case. They seize upon one single portion of the court's instructions which includes the expression, "if you find" the defendant committed the crime while he was suffering from a mental disease or defect which caused him to commit it, you may find the defendant not guilty by reason of insanity; this, they say, "informed the jury that the burden of convincing them—which is the burden of proof—was on the defendant." It will be noted that in the passage from the charge which the majority criticize, not

a word is said about the burden of proof. The most the court said was, in effect, this: "if you find causative insanity, you may reach a verdict of not guilty on that ground."

Exactly the same thought was expressed in the trial judge's charge in the Askins case.[7] The opinion does not indicate that it was preceded and followed by carefully correct instructions as to the burden of proof on the insanity issue, as is the case here. Judge Danaher, writing for himself and Judge Prettyman, said, "We cannot doubt where the instructions were so clear, that the jury rejected the defense of insanity." Again he said, "There can be no doubt that the instructions were correct and adequate for the guidance of the jury." Judge Fahy's dissent in that case does not suggest that the charge was erroneous as to the burden of proof on insanity. Yet, the majority say in the case at bar that similar language in the charge "informed the jury that the burden * * * of proof was on the defendant." It had not seemed so in the Askins case.

I have pointed out that the one challenged portion of the charge does not purport to deal with or even mention the burden of proof. The majority's conclusion that it placed the burden of proof on Blocker is what Justices Black, Reed and Burton once called a legalistic inference established by purely formal analysis.[8]

Drawing such a legalistic inference from one passage which does not mention burden of proof is particularly improper here because the preceding portion of the charge carefully instructed the jury that the Government has the burden of proof on the insanity issue, and because in the succeeding portion of the charge the judge said:

"Now, ladies and gentlemen, it should be *crystal clear to you* that where some evidence is introduced to you the presumption of sanity disap-

7. Askins v. United States, 97 U.S.App. D.C. 407, 231 F.2d 741, 743, certiorari denied 1956, 351 U.S. 989, 76 S.Ct. 1054, 100 L.Ed. 1502.

8. Mr. Justice Black dissenting in Bihn v. United States, 1946, 328 U.S. at page 640, 66 S.Ct. at page 1175, 90 L.Ed. 1485.

pears and the responsibility from that point on is on the Government. *It is not a responsibility which is on the defendant to prove any mental illness or that the mental illness was the causal effect or the motivating force behind the act in question. Those are responsibilities for the Government."* (My emphasis.)

This was the last statement in the charge as to the burden of proof on the insanity defense; it was put squarely and correctly upon the Government. It was more favorable to the appellant than he deserved, for the introduction of some evidence of insanity does not cause the presumption of sanity to disappear. The presumption remains and is to be considered by the jury in connection with the evidence on the subject. Davis v. United States, 1895, 160 U.S. 469, 488, 16 S.Ct. 353, 40 L.Ed. 499; Douglas v. United States, 1956, 99 U.S.App.D.C. 232, 239 F.2d 52.

The question is not merely whether the criticized portion of the charge was erroneous, but whether the charge in its entirety left the jury in doubt as to whether the burden of proof was upon the Government or the defendant. Only in that event could the charge be said to have been prejudicial. I think the charge, considered as a whole as it must be, made it "crystal clear," as the trial judge said, that the burden of proof was on the Government. It is impossible for me to believe that any juror of ordinary intelligence could have been confused as to where the burden of proof lay.

Even though a jury's verdict causes the imposition of the death penalty, it should not be set aside unless prejudicial error appears. Perceiving none here, I would affirm.

In the main, I agree with Judge BURGER's concurring opinion, except I do not think the views he has expressed require or justify concurrence in a reversal of the judgment of conviction. I think his criticism of this court's 1954 rule on criminal responsibility is sound, and I concur. The decision in Durham v. United States, in which I took no part,[9] has always seemed wrong to me, for two reasons. First, it is contrary to the Supreme Court's holdings in the second Davis case; second, it is logically unsound.

As to the first reason: the Supreme Court in Davis v. United States, 1897, 165 U.S. 373, 17 S.Ct. 360, 41 L.Ed. 750, at least impliedly recognized the tests of criminal responsibility as being whether the accused was incapable, because of some mental disorder, of distinguishing between right and wrong with respect to the act, or whether he was unable, because of such disorder, to refrain from doing wrong. In Fisher v. United States, 1946, 328 U.S. 463, 466, 66 S.Ct. 1318, 90 L.Ed. 1382, these tests were referred to with apparent approval. Nothing in any Supreme Court opinion since the second Davis case casts any doubt upon my interpretation of it. The Fifth and Ninth Circuits have considered themselves bound to follow the tests of criminal responsibility contained in the Davis opinion.[10] I do not agree that we are at liberty to promulgate a rule of criminal responsibility different from that approved by the Supreme Court. Doing so would be, I think, "egregious error," which the opinion in the Fisher case says will be corrected, despite our autonomy in local matters.

As to the second reason: I cannot agree that one who knows right from wrong, but freely, knowingly and deliberately chooses to do the wrong can be heard to say some sort of mental disease or defect caused his criminal conduct. To be an excuse from criminal responsibility the disease must have been such as to destroy the ability to understand what is

---

9. The Durham case was decided by a division composed of Judges Edgerton, Bazelon and Washington.

10. Howard v. United States, 5 Cir., 1956, 232 F.2d 274; Sauer v. United States,

9 Cir., 241 F.2d 640, certiorari denied 1957, 354 U.S. 940, 77 S.Ct. 1405, 1 L. Ed.2d 1539.

right and what is wrong, or to take away the actor's mental power to control his own actions. Yet the Durham opinion calls the right-wrong test a "discredited criterion."

Of course, the problem of proof concerning a defendant's mental power to distinguish between right and wrong or to control his conduct does indeed present difficulties; but in my view the criterion itself cannot properly be said to be discredited.

It is interesting, and I think significant, to note that in the period of more than six years since its announcement the Durham rule has not been accepted by any other jurisdiction, as far as I know. The rule obtains only here and in New Hampshire where it originated in 1870. The Durham case has been presented to and urged upon many courts. It has been considered and rejected by three federal courts of appeals, by the United States Court of Military Appeals, and by the highest courts of twenty states, as Judge BURGER points out.